1

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

3

4

5

ALWIN CAMACHO-MORALES,

6

Plaintiff,

7

v.

8

HECTOR PEQUERA, et al.,                    Civil No. 12-1533 (GAG)

9

Defendants.

10

11

12

**OPINION AND ORDER**

13

14          Alwin Camacho-Morales ("Plaintiff") alleges constitutional violations against several current

15  and former Puerto Rico police and Federal Bureau of Investigation ("FBI") officers (collectively

16  "Defendants") pursuant to 42 U.S.C. § 1983 ("Section 1983").   Plaintiff states that he served as an

17  agent of the Puerto Rico Police Department ("PRPD") for over fifteen years and, simultaneously,

18  an undercover FBI informant during "Operation Guard Shack," during which "dozens of police

19  officers were arrested on corruption charges." (Docket No. 1 at 5.)  Plaintiff also claims he worked

20  part-time at the Guaynabo CompUSA store as the Loss-Prevention Manager, where an agent of the

21  Puerto Rico Special Investigations Bureau and FBI Special Agent Norman Quilichini solicited his

22  assistance with uncovering corrupt activities in the PRPD.  (Id. at 5-6.)  Plaintiff accepted the

23  undercover assignment a few days later.  (Id. at 6.)

24          Plaintiff states that he worked undercover between 18 and 24 months, compiling records

25  sufficient for a magistrate to issue warrants in over one hundred cases and resulting in "the biggest

26  anti-corruption operation in the Bureau's history."  (Id. at 6-7.)  The day after the operation ended,

27  Plaintiff alleges his PRPD supervisors "administratively transferred" him from Bayamon to Gurabo

28  in retaliation for "Plaintiff's denouncements as a special undercover agent, which involved a great

**Civil No. 12-1533 (GAG)**

1   matter of public concern." (Id. at 7.)  Plaintiff alleges the FBI ordered Plaintiff and his family to stay

2   in a hotel and, subsequently, sequestered in their home due to death threats.   (Id. at 8.)

3   Consequently, due to his prolonged absence, he lost his job at CompUSA, but was later rehired.

4   (Id.)  Plaintiff also states that his superiors reassigned him to PRPD headquarters in Hato Rey in

5   retaliation for his undercover work, despite his pleas to avoid the area due to the presence of several

6   officers whom he investigated. (Id. at 8-9.) Plaintiff claims his superiors and colleagues consistently

7   insulted him, issued death threats against him, and his superiors refused to provide him and his

8   family with security.  (Id. at 9, 11.)

9        Plaintiff submitted his resignation letter on June 8, 2011, stating his intent to resign on June

10   28, 2011.  (Id. at 12.)  However, on June 27, 2011, Plaintiff attempted to revoke his resignation,

11   which he claims Defendant Reinaldo Bermudez granted on July 6, 2011.  (Id.)  However, Plaintiff

12   asserts, a letter dated July 11, 2011, "states that Co-Defendant Ms. Yadira Rivera Pabon, Director

13   of Human Resources, proceeded to keep Plaintiff's resignation effective retroactively [to] June 28,

14   2011 . . ." and remove Plaintiff from the PRPD.  (Id.)  Plaintiff alleges Defendants failed to afford

15   him the right to a pre-termination hearing.  (Id. at 13.)  Plaintiff claims violations of the First

16   Amendment, the Fourteenth Amendment's Due Process Clause, and several Puerto Rico statutory

17   and constitutional provisions.  (Id. at 15-17.)

18        Defendants moved to dismiss Plaintiff's complaint  (Docket No. 28), and Plaintiff replied

19   in opposition (Docket No. 38).  For the following reasons, the court **DENIES** Defendants' motion

20   to dismiss.  (Docket No. 28.)

21   **I.        Motion to Dismiss Standard**

22        "The general rules of pleading require a short and plain statement of the claim showing

23   that the pleader is entitled to relief."  Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45,

24   48 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted).  "This short and plain

25   statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon

26   which it rests.'"  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

27

28                                                    2

**Civil No. 12-1533 (GAG)**

Under Rule 12(b)(6), a defendant may move to dismiss an action against him for failure to state a claim upon which relief can be granted.  See FED. R. CIV. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  The court must decide whether the complaint alleges enough facts to "raise a right to relief above the speculative level."  Id. at 555.  In so doing, the court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor.  Parker v. Hurley, 514 F.3d 87, 90 (1st Cir. 2008).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678-79 (quoting Twombly, 550 U.S. at 555).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

**II.    Discussion**

Section 1983 creates a private right of action for redressing abridgments or deprivations of federally assured rights.  Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2006) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)).  Plaintiff claims Defendants violated his First Amendment rights and failed to afford him due process.  The court considers each allegation in turn.

A.  Plaintiff's First Amendment Claim

Plaintiff claims Defendants retaliated against him for working undercover for the FBI by failing to provide him and his family with security detail and imposing a hostile work environment on him for expressing his opinions on a matter of public concern.  The First Circuit has articulated a three-part inquiry to determine whether an adverse employment action against a public employee violates First Amendment free speech rights.  See Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir.

**Civil No. 12-1533 (GAG)**

1  2011).  In sum, the court must: (1) determine whether the employee spoke as a citizen on a matter
2  of public concern; (2) balance the interests of the employee, as a citizen, in commenting upon
3  matters of public concern and the interest of the state, as an employer, in promoting the efficiency
4  of public services, and; (3) determine whether an employee shows that the protected expression was
5  a substantial or motivating factor in the adverse employment decision.  Id.  The court denies
6  Defendants' motion to dismiss because adjudicating whether Plaintiff satisfies the first requirement
7  of Decotiis is premature at this stage.

8       Generally, "the First Amendment prohibits government officials from subjecting an
9  individual to retaliatory actions . . . for speaking out."  Mercado-Berrios v. Cancel Alegria, 611 F.3d
10  18, 25-26 (1st Cir. 2010).  However, "[g]overnment employees undoubtedly walk a tight rope when
11  it comes to speaking out on issues that touch upon their fields of work and expertise."  Decotiis, 635
12  F.3d at 29.  "The [Supreme] Court has made clear that public employees do not surrender all their
13  First Amendment rights by reason of their employment.  Rather, the First Amendment protects a
14  public employee's right, in certain circumstances, to speak as a citizen addressing matters of public
15  concern."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  The Court held "that when public
16  employees make statements pursuant to their official duties, the employees are not speaking as
17  citizens for First Amendment purposes, and the Constitution does not insulate their communications
18  from employer discipline."  Id. at 421.

19       In Mercado-Berrios, the First Circuit interpreted how to grapple with Decotiis's first
20  threshold, whether the employee spoke as a citizen on a matter of public concern.  The Mercado-
21  Berrios court held that the first prong includes "two basic components – (1) what are the employee's
22  official responsibilities, and (2) was the speech at issue made pursuant to those responsibilities –
23  both of which are highly context sensitive."  611 F.3d 18, 26 (1st Cir. 2011).  Speech "made
24  pursuant to employment duties" includes speech that "'owes its existence to a public employee's
25  professional responsibilities,' speech that the employer 'has commissioned or created', speech that
26  the employee 'was paid to' make, speech that the employee's 'duties . . . required him to' make,
27  speech that amounts to the employee's 'work product', and speech that is an 'official

28                                                    4

Civil No. 12-1533 (GAG)

1    communication[].'" Decotiis, 635 F.3d at 30 (quoting Garcetti, 547 U.S. at 421-23).

2         The court finds the Decotiis court's examples seem to encompass the facts at bar.  The
3    first prong of the Decotiis test requires examining Plaintiff's job responsibilities.  Plaintiff states that
4    he accepted a position as an "undercover corrupt officer" and posed "as a corrupt
5    official offering fellow cops large sums [of] money on behalf of local drug-traffickers in exchange
6    for transporting the drug[s] to another location within the island of Puerto Rico," worked "his regular
7    8-hour shift as a police officer and his part-time job at CompUSA, in addition to undercover work,
8    which could easily take him an additional 8 to 10 hours a day," and "performed dozens of
9    undercover drug transactions with active police officers" while the "transactions were recorded and
10   conducted under the supervision of FBI agents."  (Docket No. 1 at 5-6.)

11        Analysis under the second prong reveals that Plaintiff's speech, for which he alleges the
12   discrimination arose, directly pertains to his official responsibilities.  Plaintiff asserts that "in a clear
13   retaliation [for] his denouncements of great public concern that led to corruption indictments in [the]
14   United States District Court for the District of Puerto Rico, he was assigned by Defendants to the
15   PRPD General Headquarter[s]."  (Id. at 8.)  To reiterate, Plaintiff also claims his superiors and
16   colleagues consistently insulted him, PRPD officers issued death threats against him, and his
17   superiors refused to provide him and his family with security because of his work with the FBI.  (Id.
18   at 9, 11.)  Plaintiff was transferred "in a continuous retaliation against Plaintiff and as a mitigation
19   mechanism in order to avoid Plaintiff to expose more corrupt officer[s] from Bayamon," i.e., to
20   prevent him from engaging in the tasks which comprised his responsibilities with the FBI.
21   (Docket No. 38 at 6.)  Plaintiff's speech was "entirely related to matters concerning" the police force
22   and his work with the FBI.  Decotiis, 635 F.3d at 31 (quoting Foley v. Town of Randolph, 598 F.3d
23   1, 2-4 (1st Cir. 2010)).  These facts squarely fit the mold created by the examples of speech "made
24   pursuant to employment duties" in Decotiis.

25        However, in an abundance of caution and following the example of several courts, the court
26   shall wait until the summary judgment stage before undertaking a comprehensive Garcetti analysis.
27   See Velazquez v. Mun. of Carolina, Civil No. 11-1586 (SEC),*8-9 (Dec. 14, 2012); see also Watts

28                                                    5

v. City of Jackson, 827 F. Supp. 2d 724, 728-732 (S.D. Miss. 2011) (counseling reservation of judgment until summary judgment and providing several factors to consider in analyzing Garcetti in police retaliation case where officers served as FBI informants).  The court urges the parties to look to the Watts court's factors.    For example, how did the PRPD know that Plaintiff was an informant?   How did Defendants learn of the matters for which Plaintiff alleges he was discriminated?  Was Plaintiff legally bound to disclose any observations of corrupt practices, regardless of formal or informal employment with the FBI? The court will need answers to these and other questions answered before it can appropriately determine whether to dismiss this case.  While the court is inclined to agree with the conclusion reached by the Watts court, persuasive precedent dictates that the court abstain.  The court would like for the parties to more thoroughly address the extent to which Plaintiff is, or is not, speaking as a "citizen" for Garcetti purposes.

   B.  Plaintiff's Due Process Allegations

   Plaintiff next claims that Defendants violated his due process rights by effectuating his resignation, which Plaintiff alleges he rescinded prior to its effective date and Defendants refused to accept.   Refusal to accept an attempt to rescind a resignation and subsequent termination without process does not constitute a violation.   See e.g., Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1180 (10th Cir. 2010); Fross v. Monett R-I Bd. of Educ., 431 F.3d 606, 612 (8th Cir. 2005); Ulrich v. City & Cnty. of San Francisco, 308 F.3d 968, 974-76 (9th Cir. 2002); Graehling v. Village of Lombard, 56 F.3d 295, 296-99 (7th Cir. 1995) (Easterbrook, J., writing for the panel).  See also Hardy v. Birmingham Bd. of Educ., 954 F.2d 1546 (11th Cir. 1992) (holding consideration of withdrawal of a resignation letter proper only because the employer informed the employee that he could do so before the effective date). Therefore, the court will not consider whether Plaintiff was deprived of process because he simply failed in his effort to rescind his resignation.    See Monahan v. Romney, 625 F.3d 42, 47 (1st Cir. 2010) (citing Stone v. Univ. of Maryland Med. Syst. Corp., 855 F.2d 167, 173 (4th Cir. 1988) ("If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot

**Civil No. 12-1533 (GAG)**

establish that the state 'deprived' him of it within the meaning of the due process clause.")).

However, Plaintiff alleges Defendant Reinaldo Bermudez granted Plaintiff's request to rescind his resignation letter before he was terminated.  Therefore, Plaintiff's claim must proceed to the summary judgment stage.  Defendants' motion to dismiss Plaintiff's due process claim is **DENIED.**

**III.     Conclusion**

For the aforementioned reasons, the court **DENIES** Defendants' motion to dismiss. (Docket No. 28.)

**SO ORDERED.**

In San Juan, Puerto Rico this 7th day of February, 2013.

/S/ Gustavo A. Gelpí
GUSTAVO A. GELPI
United States District Judge

7