## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

ALWIN CAMACHO-MORALES,

     Plaintiff,

     v.

                                    Civil No. 12-01533 (BJM)

JOSÉ CALDERO, *et al.*,

     Defendants.

## OPINION AND ORDER

In an amended complaint, plaintiff Alvin Camacho-Morales ("Camacho") brought this action under 48 U.S.C. § 1983 against Puerto Rico Police Department ("PRPD") Superintendent José Caldero, in his official capacity;[1] former Superintendents[2] Emilio Díaz Colón ("Díaz") and José Figueroa Sancha ("Figueroa"), in their personal and official capacities; Associate Superintendent José Luis Rivera Díaz ("Rivera Díaz"), in his personal and official capacity; Officers Leovigildo Vásquez ("Vásquez"), Reinaldo Bermúdez Ortiz ("Bermúdez"), José Rivera Alicea ("Rivera Alicea"), and Digno Cartagena,[3] in their personal and official capacities; Human Resources Department employee Yadira Rivera Pabón ("Rivera Pabón"), in her personal and official capacity; and the Commonwealth of Puerto Rico (the "Commonwealth"), alleging violations of his rights under the First and Fourteenth Amendments to the United States Constitution, as well as under the laws and Constitution of Puerto Rico.  Docket No. 5 ("Amend. Compl.").

Defendants moved to dismiss the complaint for failure to state a claim.  Docket Nos. 28, 32.  The court denied the motion.  Docket No. 40.  Camacho then moved for partial summary judgment, Docket No. 54 ("Pl.'s Mot."), and defendants moved for summary

---

[1] The amended complaint named Hector Pesquera, Superintendent at the time of filing, as a defendant in his personal and official capacities.  The parties stipulated to the dismissal with prejudice of all claims against Pesquera, and to the substitution of José Caldero, the current Superintendent, as a defendant in his official capacity.  Docket No. 105; *see* Fed. R. Civ. P. 25(d).

[2] Unless otherwise specified, all titles, positions, and offices are with the PRPD.

[3] The case was stayed as to defendant Cartagena pending bankruptcy proceedings.  Docket No. 102.

judgment on all claims, Docket No. 56 ("Defs.' Mot."). Both sides opposed the other's summary judgment motion. Docket Nos. 68 ("Pl.'s Opp."), 70 ("Defs.' Opp."). Camacho also filed a reply. Docket No. 84. The parties consented to proceed before a magistrate judge. Docket Nos. 77, 80.

For the reasons set forth below, Camacho's motion for partial summary judgment is **denied**, and defendants' motion for summary judgment is **granted as to the federal claims**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). The court does not weigh the facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1). If this threshold is met, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not prevail with mere "conclusory allegations, improbable inferences, and unsupported speculation" for any element of the claim. *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Still, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," *Leary*, 58 F.3d at 751, and the court must not "superimpose [its] own ideas of

probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).

## BACKGROUND

This summary of the facts is guided by the parties' Local Rule 56 statements of uncontested facts.[4] *See* Docket Nos. 54-1 ("Pl.'s SUMF"), 57 ("Defs.' SUMF"), 68-1 ("Pl.'s OSMF"), 70-1 ("Defs.' OSMF").

Camacho worked as a PRPD officer from 1996 until July 2011. Pl.'s SUMF ¶ 1. He first developed a relationship with the FBI in 1999, when he was put in contact with the agency after reporting his observations of illegal conduct within the PRPD to a supervisor and to Puerto Rico's Special Investigation Bureau (Spanish acronym "NIE"). Defs.' SUMF ¶¶ 1–2. From 1999 to 2006, Camacho covertly collected information about corruption inside the force and relayed it to the FBI. Defs.' SUMF ¶¶ 3, 6–7. He testified that, during this period, he viewed himself as acting as a sort of undercover agent for the FBI, though technically, because he was still a PRPD officer, he was really acting as a "confidential source." Defs.' SUMF ¶¶ 4, 8–9; Pl.'s OSMF ¶¶ 8–9. He stopped regularly providing the FBI with information in 2006, but for the next two years, the FBI contacted him every six months to ask whether he had witnessed any corrupt activities. Defs.' SUMF ¶ 10.

In November 2009, Camacho was approached at a CompUSA store, where he worked part-time as a loss prevention manager, by an NIE agent, whom he had known since 1999, and an FBI agent. Pl.'s SUMF ¶ 2; Defs.' SUMF ¶ 2, 13–14. At the time, Camacho was not actively participating in any FBI investigation. Defs.' SUMF ¶ 14; Pl.'s OSMF ¶ 14. The agents asked him to participate in an ongoing FBI investigation into police

---

[4] Local Rule 56 requires parties at summary judgment to supply brief, numbered statements of facts, supported by citations to admissible evidence. It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and prevents litigants from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007). The rule "permits the district court to treat the moving party's statement of facts as uncontested" when not properly opposed, and litigants ignore it "at their peril." *Id.*

corruption, later known as Operation Guard Shack, by posing as a corrupt officer himself; he agreed. Pl.'s SUMF ¶ 3–4; Defs.' SUMF ¶ 18. For about 10 months, until September 2010, he took part in illegal activities with other PRPD officers and reported his observations directly to the FBI agent who had asked him to serve as an informant. Pl.'s SUMF ¶ 5; Defs.' SUMF ¶ 25, 27. The FBI did not instruct Camacho to take any particular actions or gather any particular information. Pl.'s SUMF ¶ 5. Although Camacho did not know it at the time, at least four other PRPD officers were providing the FBI with information in the same manner. Pl.'s SUMF ¶ 7; Defs.' SUMF ¶¶ 19, 26; Pl.'s OSMF ¶ 26.

In October 2010, almost 100 Puerto Rico law enforcement officers were arrested, at least in part due to the evidence furnished by Camacho. Pl.'s SUMF ¶ 9. For security reasons, Camacho took leave from the PRPD from August 2010 to April 2011. Pl.'s SUMF ¶ 13; Defs.' SUMF ¶ 26. Soon after the arrests, while Camacho was still on leave, he learned that he had been transferred from his current unit, the Tactical Operations Division in Bayamón, to the Police Academy in Gurabo. Pl.'s SUMF ¶ 15; Defs.' SUMF ¶ 29. Camacho testified that he does not know precisely who was responsible for his transfer to the Academy. Defs.' SUMF ¶ 30. Specifically, as far as he knows, his transfer was not ordered by Rivera Alicea or Rivera Díaz. Defs.' SUMF ¶¶ 31-33. He never actually worked a day at his new post; while he was still on leave, he received notice of another transfer, this time to the Joint Operations Division ("JOD"), located at the PRPD's General Headquarters in San Juan, effective April 6, 2011. Pl.'s SUMF ¶¶ 19; Defs.' SUMF ¶ 37, 39.

The JOD is responsible for coordinating and integrating the efforts of the PRPD and the federal government; it is divided into task forces that work with various federal law enforcement agencies, including the FBI. Defs.' SUMF ¶ 51. Starting in May 2011, Rivera Alicea served as the director of the JOD. Defs.' SUMF ¶¶ 50, 52, 62. As with his first transfer to the Academy, Camacho testified that he lacks personal knowledge as to who assigned him to the JOD. He does not know whether any of Figueroa, Rivera Díaz, Vásquez, Bermúdez, or Rivera Alicea was directly responsible. Defs.' SUMF ¶¶ 40–44. However, he

points to the PRPD's internal guidelines, which provide that the Superintendent and Associate Superintendent have authority to transfer officers within divisions.  Pl.'s SUMF ¶ 21.  In any case, it is uncontested that in February 2011, the FBI asked Figueroa, then Superintendent, to transfer Camacho to the JOD, along with other officers who had served as informants in Operation Guard Shack.  Pl.'s SUMF ¶ 18; Defs.' SUMF ¶ 35.  Camacho did not actually want to be transferred to the JOD, because of threats against his life that had been received at General Headquarters.  Pl.'s SUMF ¶¶ 19–20; Defs.' SUMF ¶ 59.

At his new post, Camacho had very little to do;  Rivera Alicea testified that the office did not generate enough administrative work to fully occupy Camacho and the two other officers who had been transferred to the JOD at the time.  Pl.'s SUMF ¶ 24.  Camacho was not assigned to any of the JOD's task forces.  *Id.*  Generally, officers are assigned to task forces at the request of the relevant federal agency, with the approval of the PRPD.  Defs.' SUMF ¶ 52; Pl.'s OSMF ¶ 52.  Rivera Alicea testified, however, that he never received a request, at least from the FBI, to place Camacho on a task force.  Defs.' SUMF ¶ 52.  While at General Headquarters, Camacho never complained about harassment by his coworkers, and Rivera Alicea never witnessed any harassment.  Defs.' SUMF ¶¶ 62–63

On May 13, 2011, Camacho met with Bermúdez, and two other PRPD officers who had played roles in Operation Guard Shack similar to Camacho's.  Pl.'s SUMF ¶ 28; Defs.' SUMF ¶ 72.  The meeting was ordered by Superintendent Figueroa to address concerns that had been expressed by officers who had, like Camacho, covertly participated in Operation Guard Shack.  Pl.'s SUMF ¶ 27; Defs.' SUMF ¶ 69.  The previous day, in fact, the other two officers had appeared on a radio show and made statements critical of the PRPD.  Pl.'s SUMF ¶ 25; Defs.' SUMF ¶ 67.

 At the meeting, Bermúdez proposed that Camacho and the other two officers make a formal complaint to the Cuerpo de Investigación Criminal regarding the death threats that they had received.  Defs.' SUMF ¶ 74; Pl.'s SUMF ¶ 28.  Camacho and the other officers declined; they told Bermúdez that the FBI was independently looking into the threats and

that they preferred to let it handle the investigation.  Defs.' SUMF ¶ 75.  Similarly, they declined to be provided with security details because of concerns that they could be infiltrated by corrupt officers.  Pl.'s SUMF ¶ 28; Defs.' SUMF ¶ 79.  The minutes of the meeting, which Camacho signed, also indicate that the PRPD provided Camacho with a more powerful handgun, a rifle, and a portable radio for his protection.[5]  Defs.' SUMF ¶¶ 76–78.  After the meeting, Camacho told Bermúdez, "If you're not going to help me for whatever reason, if you're not going to help, then tell the superintendent that I want to leave." Defs.' SUMF ¶ 84.  Camacho also requested a personal meeting with Superintendent Figueroa, but no such meeting ever took place.  Pl.'s SUMF ¶ 29.

On two occasions, the FBI gave Camacho money, totaling between $50,000 and $60,000.  Defs.' SUMF ¶¶ 66, 86, 109; Pl.'s OSMF ¶¶ 66, 85–86, 109.  According to Camacho, the money was for security purposes, prompted by threats against his life, and he used it to relocate his family to the United States.  Pl.'s OSMF ¶¶ 66, 86–86, 109.  Camacho denies that the money was compensation for his services in Operation Guard Shack.  Pl.'s OSMF ¶ 66.

On June 8, 2011, Camacho submitted a letter of resignation, effective June 28, to the Department of Human Resources.  Pl.'s SUMF ¶ 32; Defs.' SUMF ¶ 87.  He told Cartagena that he was resigning because he was upset with the system, and that he planned to leave Puerto Rico for the United States.  Defs.' SUMF ¶ 94.  On June 27, Camacho submitted another letter changing the effective date of his resignation to September 5.  Pl.'s SUMF ¶ 33; Defs.' SUMF ¶ 95.  Camacho wrote in the letter that the new effective date was subject to approval by Figueroa; if Figueroa did not accept the new terms, the resignation would have no effect.  On July 5, Camacho signed a third letter, drafted by Rivera Alicea,

---

[5] Camacho objects on hearsay grounds to defendants' use of the minutes to support various facts.  *See* Fed. R. Evid. 802; *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").  But Camacho signed the minutes, certifying that they were true.  The minutes are therefore nonhearsay when offered against Camacho as the adopted statements of an opposing party.  *See* Fed. R. Evid. 801(d)(2).

rescinding his resignation altogether.  Pl.'s SUMF ¶ 34; Defs.' SUMF ¶ 96.  Rivera Alicea

forwarded the letter to Bermúdez, who forwarded it to Human Resources.  Pl.'s SUMF ¶ 34.

Bermúdez's subordinate, Francisco Rodriguez, also apparently forwarded the letter to

Superintendent Díaz, who had assumed office on July 6, with a recommendation that he

allow Camacho to rescind the resignation.  Pl.'s SUMF ¶ 35; Defs.' SUMF ¶ 110.

> Section 14.8 of the PRPD Staff Bylaws provides:
>
> Any employee may resign his position freely through written notification to
> the Superintendent.  This notification will be made with not less than fifteen
> (15) days prior to his last day of work, except that the Superintendent may
> accept resignations presented in a shorter period of time.  The Superintendent
> must within the term of fifteen (15) days of having said resignation been
> submitted, notify the employee if he accepts the same or if he rejects it
> because there are reasons to justify investigating the conduct of the
> employee.  In cases of rejection, the Superintendent, within the shortest time
> possible, must conduct the investigation and determine if he accepts the
> resignation or proceeds with the formulation of charges.

Pl.'s SUMF ¶ 41; Docket No. 93-2.  The procedures for resignation are governed more

particularly by PRPD General Order No. 79-6, which provides that an employee must submit

his notice of resignation for endorsement to his immediate supervisor, who must then have

the employee fill out Form PPR-210, certifying that he has no remaining obligations to the

PRPD.  Pl.'s SUMF ¶ 42; Docket No. 93-11.  The form and a copy of the resignation notice

are then to be submitted to the Director of Personnel and forwarded by him to the

Superintendent for his signature.  Pl.'s SUMF ¶ 42; Docket No. 93-11.  General Order No.

79-6 states that the Director of Personnel must not process any resignation not accompanied

by a completed Form PPR-210.  Pl.'s SUMF ¶ 42; Docket No. 93-11.

On July 8, after investigating an irregularity in his June paycheck, Camacho learned

from Human Resources that he had been removed from the PRPD's system effective June

27.  Pl's SUMF ¶ 37.  In a July 11 memo to Bermúdez, Rivera Alicea noted that he had been

told by Rivera Pabón that Camacho's resignation was effective as of June 28.  Pl.'s SUMF

¶ 38; Defs.' SUMF ¶ 97.  In mid-July, before Camacho received any official notice from the

Superintendent about the status of his resignation, Rivera Alicea took possession of Camacho's service weapons, pursuant to PRPD policy, behind the CompUSA store where Camacho worked part-time.  Pl.'s SUMF ¶ 40; Defs.' SUMF ¶ 107.

On August 31, a letter was issued on Superintendent Díaz's letterhead informing Camacho that his resignation had been accepted effective June 28.  Pl.'s SUMF ¶ 46.  Díaz testified that he did not sign the letter and that he does not recognize its signature.  Pl.'s SUMF ¶ 46.  Díaz was present in office at the time the letter was issued.  Pl.'s SUMF ¶ 49.  According to defendants, the letter was signed by Associate Superintendent Rivera Díaz.  Defs.' OSMF ¶ 46.  There is some disagreement about when, or if, Camacho received the letter; Camacho submits that it was not sent to the correct address.  Pl.'s SUMF ¶ 53; Defs.' OSMF ¶ 53.  In any case, in December, Camacho filled out Form PPR-210 and went through the other procedures necessary to effect his separation from the PRPD, including handing over his badge.  Pl.'s SUMF ¶¶ 51–52; Defs.' SUMF ¶ 108.  Camacho requested a meeting with the Superintendent on several occasions without success.  Pl.'s SUMF ¶ 54.  No hearing was held before Camacho's employment was officially terminated.  *Id.*

## DISCUSSION

Camacho alleges that defendants retaliated against him for his participation in Operation Guard shack in violation of the First Amendment by transferring him twice, subjecting him to harassment, failing to provide him with adequate protection, and accepting his resignation.  He also alleges that the acceptance of his resignation violated his right to due process under the Fourteenth Amendment, characterizing his separation from the PRPD as a de facto termination for which some degree of process was required.  His claims under the laws and Constitution of Puerto Rico are based on the same conduct and grounded in similar theories.  He seeks monetary relief, including punitive damages, and injunctive relief in the form of reinstatement.  He moves for summary judgment as to whether his communications with the FBI were the motivating factor behind defendants' alleged acts of retaliation, and as to the entirety of his due process claim.

Defendants argue for summary judgment on several grounds.  As to both the First and Fourteenth Amendment claims, they contend that Camacho has failed to personally connect any individual defendant to the conduct alleged, that the claims are partially barred by the Eleventh Amendment, and that they are protected by the doctrine of qualified immunity.  As to the First Amendment claim in particular, they argue that Camacho did not suffer any adverse employment action; that even if there were a constitutional deprivation, Camacho has failed to produce evidence sufficient to connect any individual defendant to that deprivation; and that Camacho's communications with the FBI do not qualify as protected speech.  They argue that the due process claim must fail because Camacho resigned from the PRPD voluntarily.  Finally, they urge that the court should, if it dismisses Camacho's § 1983 claims, decline to exercise supplemental jurisdictions over the claims founded in state law.

## I.       Eleventh Amendment

As a threshold matter, defendants assert that Camacho's claims against the Commonwealth of Puerto Rico and the individual defendants in their official capacities are barred by the Eleventh Amendment.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend XI.  Despite the literal language of the amendment, this immunity extends to states sued by their own citizens as well as by citizens of other states.  *Seminole Tribe of Fla. v. Florida*, 17 U.S. 44, 54 (1996).  The First Circuit has consistently held that Puerto Rico is considered a "State" for purposes of the Eleventh Amendment.  *See Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth.*, 991 F.2d 935, 939 n.3 (1st Cir. 1993) (collecting cases).  The sovereign immunity established by the Eleventh Amendment is not absolute, but may be waived by a state or abrogated by Congress.  *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Metcalf & Eddy*, 991 F.2d at 938.  But Congress did not abrogate the immunity by

adopting § 1983, *Quern v. Jordan*, 440 U.S. 332, 340–42 (1979), and Camacho makes no suggestion that the Commonwealth has specifically consented to be sued in this case. Accordingly, all of Camacho's claims against the Commonwealth must be dismissed.

As for his claims against PRPD employees: the Eleventh Amendment extends not only to states themselves, but also to public entities that function as arms or alter egos of the state. *See Ainsworth Aristocrat Intern. Pty. Ltd. v. Tourism Co. of P.R.*, 818 F.2d 1034, 1036 (1st Cir. 1987) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). It is well-settled that the PRPD is considered an alter ego of the Commonwealth. *Nieves Cruz v. Puerto Rico*, 425 F. Supp. 2d 188, 192 (D.P.R. 2006). And because suits against state officers in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978), the Eleventh Amendment applies to Camacho's official-capacity claims.

However, those official-capacity claims premised on federal law are barred only to the extent that they seek "to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651 (1974). Under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment does not preclude Camacho from seeking prospective declaratory or injunctive relief from state officers in their official capacities for a violation of federal law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *Mills v. Maine*, 118 F.3d 37, 54 (1st Cir. 1997) (citing *Seminole Tribe*, 517 U.S. at 73). This exception does not apply to official-capacity claims grounded in state law; such claims are barred no matter the relief sought. *Halderman*, 465 U.S. at 106. Camacho's Commonwealth law claims against the individual defendants in their official capacities are therefore dismissed.

In his First Amendment claim under § 1983, Camacho seeks $3,000,000 in compensatory damages, apparently from each defendant, an unspecified amount in punitive damages, back pay, and front pay. In his due process claim under § 1983, he seeks only back

pay and front pay.[6]  As against the individual defendants in their official capacities, the requested relief is wholly barred by the Eleventh Amendment.  An award of damages, whether compensatory or punitive, would obviously require the Commonwealth to open its coffers.  Back pay, which "compensates plaintiffs for lost wages and benefits between the time of the discharge and the trial court judgment," *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 379 (1st Cir. 2004), would have the same effect, and the First Circuit has accordingly held that "the Eleventh Amendment bars an award of back pay against a state or an alter ego of the state," *Figueroa-Rodriguez v. Aquino*, 863 F.2d 1037, 1044 (1st Cir. 1988).

Front pay is an equitable remedy consisting of "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."  *Johnson*, 364 F.3d at 379 (quoting *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001)).  Though the First Circuit has not addressed whether front pay is precluded by the Eleventh Amendment despite its function as an alternative to reinstatement, a permissible form of prospective relief under *Ex Parte Young*, s*ee Whalen v. Mass. Trial Court*, 397 F.3d 19, 30 (1st Cir. 2005), those courts of appeals to have considered the issue have found that it is.  *See Campbell v. Ark. Dep't of Corr.*, 155 F.3d 950, 962 (8th Cir. 1998); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996); *Freeman v. Mich. Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987).  An award of front pay would require the Commonwealth to compensate Camacho using public funds.  Accordingly, Camacho's request for front pay is barred by the Eleventh Amendment.

In sum, all claims against the Commonwealth and against the individual defendants

---

[6] In his amended complaint, Camacho requested, in both § 1983 claims, "preliminary and permanent injunctive relief for reinstatement, in the form of monies lost and any applicable benefits, immediate reinstatement and prohibiting defendants from taking additional adverse employment actions because of his public statements."  Amend. Compl. ¶¶ IV.4, V.3.  He subsequently informed the court that he seeks back pay and front pay but not reinstatement.  Docket No. 108.  Because he no longer seeks reinstatement, his request for injunctive relief prohibiting the defendants from engaging in future retaliatory conduct is moot.

in their official capacities are dismissed.  The Eleventh Amendment does not preclude the claims against the individual defendants in their personal capacities.[7]

## II.      First Amendment Claim

To make out a valid First Amendment retaliation claim under § 1983, a public employee such as Camacho must make a three-part showing.  *See O'Connor v. Steeves*, 994 F.2d 905, 912–13 (1st Cir. 1993).  First, he must have spoken "as a citizen upon matters of public concern," as opposed to "as an employee upon matters only of personal interest." *Id.* at 912 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).  Second, his First Amendment interest in free expression, together with the public's interest in the content of his speech, must outweigh the state's legitimate interest in curbing the speech. *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Brasslett v. Cota*, 761 F.2d 827, 839 (1st Cir. 1985)).  Third, the speech must have been "a substantial or motivating factor" in an adverse employment action taken against him.  *Id.* at 913 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  If the public employee plaintiff is able to satisfy this third prong, through direct or circumstantial evidence from which a jury could reasonably infer a causal link between his protected speech and the allegedly retaliatory conduct by his employer, he has met his initial burden.  *Diaz-Bigio v. Santini*, 652 F.3d 45, 51–52 (1st Cir. 2011) (quoting *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)).  The employer may then rebut the claim by proving, by a preponderance of the evidence, that it "would have taken the same action against the employee 'even in the absence of the protected conduct.'"  *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 51 (1st Cir. 2003) (quoting *Mt. Healthy*, 429 U.S. at 287)).

---

[7] Alternatively, Camacho's claims against the Commonwealth and those seeking damages from the individual defendants in their official capacities must be dismissed because neither states nor state officers sued in their official capacities for damages are "persons" against whom an action may be brought under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

**A.      Substantial or Motivating Factor in Adverse Employment Action**

        **1.      Substantial or Motivating Factor**

Camacho moves for summary judgment only on the third issue, asserting that he has proven that his protected speech was a substantial or motivating factor in the adverse employment actions allegedly taken against him.  Puzzlingly, however, he fails utterly to engage in any meaningful analysis of the defendants' motivations, instead focusing his argument on the first two elements of the claim.  Moreover, he acknowledges that it "is a question of fact, which normally belongs to a jury," whether protected speech was in fact the impetus behind a public employer's allegedly punitive actions, and that in this case there are "serious issues of fact" as to that question.  Pl.'s Mot. 16, 20.

Because it is difficult to prove what goes on inside a person's head—even at trial, with the opportunity to present and examine witnesses—"great circumspection is required where summary judgment is sought on an issue involving state of mind."  *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975) (citing *Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962)); *see also Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc.*, 929 F.2d 881, 889 (1st Cir. 1991) ("[S]ummary judgment is to be used sparingly when intent or motive is at issue.").  Summary judgment often will prove an inappropriate vehicle for resolution of such issues; it is not designed to appraise credibility or determine the weight properly afforded to competing versions of the facts.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."); *accord Poller*, 368 U.S. at 473; 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2730 (3d ed. 1998).

Camacho thus faces a hard row to hoe in arguing that there is no genuine issue regarding the defendants' motivations.  In any case, I cannot settle the question of intent at this stage because his motion is bereft of any developed argumentation on that point.  *See Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir.

1988) ("A party has a duty to put its best foot forward before the magistrate: to spell out its arguments squarely and distinctly. . . . Given plaintiff's obfuscation, the district court's finding that the theory was not adequately placed in issue before the magistrate was eminently supportable."). Camacho's motion for summary judgment as to the "substantial or motivating factor" issue is therefore denied.

### 2.    Adverse Employment Action

Defendants deny that Camacho was ever subjected to an adverse employment action. Camacho is far from clear in describing precisely what alleged conduct his First Amendment claim is premised on. Construed liberally, the amended complaint alleges at least five acts or non-acts that might potentially be characterized as adverse employment actions: (1) Camacho's first transfer to the Police Academy, (2) his second transfer to General Headquarters, (3) workplace harassment, (4) the PRPD's failure to provide him with adequate protection, and (5) the events surrounding his unsuccessfully withdrawn resignation. Defendants squarely address only the two transfers and the lack of protection.[8] Even if, as they argue, neither the transfers nor the lack of protection amount to adverse employment actions forbidden by the First Amendment, summary judgment solely on this ground would thus be inappropriate. Defendants have not shown that there is no genuine issue of material fact whether Camacho's other allegations qualify as adverse employment actions.[9] I will nevertheless address the arguments that defendants do make.

In the First Amendment context, the adverse employment action inquiry is a broad one, focusing " on whether an employer's acts, viewed objectively, place substantial pressure

---

[8] As discussed more particularly below, defendants argue that the evidence shows that none of the individual defendants contributed to any alleged harassment. This is not the same, however, as arguing that there was no harassment at all, or that whatever harassment there may have been was not an "adverse employment action" in violation of the First Amendment. Defendants focus on Camacho's resignation (or, according to Camacho, his de facto dismissal) only in addressing the Fourteenth Amendment claim; they do not argue that there is no adverse employment action for First Amendment purposes to be found in the end of Camacho's employment with the PRPD.

[9] I give no opinion as to whether these other allegations in fact amount to adverse employment actions.

on the employee's political views—or, more generally, on whether the defendants' acts would have a chilling effect on the employee's exercise of First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) (quoting *Bergeron v. Cabral*, 560 F.3d 1, 8 (1st Cir. 2009)) (internal quotation marks omitted). Thus, "[e]mployment actions short of outright dismissal or demotion," such as transfers, may qualify if they are sufficiently punitive to deter speech. *Rosario-Urdaz v. Velazco*, 433 F.3d 174, 178 (1st Cir. 2006) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75–76 (1990)). This standard is met when such actions "result[] in conditions 'unreasonably inferior' to the norm for that position." *Id.* (quoting *Agosto-de-Feliciano v. Aponte-Roque*, 889 F.2d 1209, 1218–19 (1st Cir. 1989) (en banc)). The plaintiff bears the burden of demonstrating that an alleged adverse employment action resulted in "unreasonably inferior" conditions by clear and convincing evidence. *Agosto-de-Feliciano*, 889 F.2d at 1220.

Camacho has not adduced any competent evidence, or made any coherent claim, that his transfer to Gurabo resulted in "unreasonably inferior" conditions. The record contains no description of his post-transfer duties. That transfer cannot, then, serve as an adverse employment action upon which to base a viable retaliation claim. His second transfer is a closer question. Camacho argues that conditions were inferior at his new post at General Headquarters because he was not placed on a task force, as he expected, or given a sufficient amount of work. While it is true that "depriving an employee of all or almost all his work for an indefinite period of time can be sufficient to establish an 'unreasonably inferior' work environment," *Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 22-23 (1st Cir. 2006), Camacho has not produced sufficient evidence to carry his burden. He has provided no specific information about the amount of work he was assigned or the amount someone in his position is normally assigned. And while he apparently expected to be assigned to a task force, the mere fact that he was not is insufficient to establish that he was treated unreasonably; officers assigned to the JOD are placed on task forces at the request of federal agencies, and Rivera Alicea never received a request for Camacho. From the evidence in the

record, a reasonable jury could not find that Camacho established "unreasonably inferior" conditions by clear and convincing evidence, and his second transfer therefore also fails to qualify as an adverse employment action.

Camacho has also failed to show that the PRPD's alleged failure to provide him with protection was meaningful enough to have a chilling effect on the speech of a reasonable employee. As defendants point out, when Camacho and the other similarly situated officers voiced concerns about their security, Figueroa, then Superintendent, ordered Bermúdez to meet with them. Figueroa then approved Camacho's request for backup and supplemental weapons. At the meeting, the PRPD offered to provide Camacho and the other officers with a protective detail, an offer they declined. The PRPD also offered to investigate the death threats received by the officers, but this offer was also declined, as they were more comfortable letting the FBI investigate independently.

Based on these facts, I cannot say that Figueroa, or the PRPD as a whole, was derelict to the point that a reasonable officer in Camacho's position would feel reluctant to speak out. Whatever other punitive measures the PRPD may have taken, it does not appear that it failed to take necessary protective action. Camacho was provided with extra arms, as he requested, and would have taken further protective steps had Camacho agreed to the proposed course of action. Camacho was apparently unsatisfied with the outcome of the meeting and requested an audience with Figueroa himself; that meeting never occurred. But it is unclear what security measures Camacho hoped to receive as a result of speaking with Figueroa. He rejected the PRPD's offers to investigate the death threats and arrange for a protective detail out of concerns—perhaps valid, perhaps not—that whatever help the PRPD provided would be tainted by corruption. If Camacho did not trust the PRPD, it is difficult to imagine what he hoped to gain from the follow-up meeting. The PRPD's alleged lack of protection, therefore, does not constitute an adverse protection action for which Camacho may seek redress under the First Amendment.

To recap: Camacho may not succeed based on the allegations that he was transferred

to the Police Academy, that he was transferred to General Headquarters, or that the PRPD failed to provide him with sufficient protection. Any claim against a particular defendant premised solely on those alleged acts (or non-acts) will be dismissed. However, defendants have failed to show that the two other alleged adverse employment actions are not viable. To prevail on their motion for summary judgment, defendants must demonstrate some other infirmity when it comes to claims based on the transfer to General Headquarters, workplace harassment, or Camacho's failed attempt to rescind his resignation.

### B.   Personal Involvement of Individual Defendants

It is well established that "the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Welch v. Ciampa*, 542 F.3d 927, 936 (1st Cir. 2008) (quoting *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). For a defendant to be liable in his personal capacity, there must be "a causal connection between [his] conduct and the [alleged] deprivation." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989). As discussed, Camacho's amended complaint locates deprivations in his two transfers, in harassment he faced at General Headquarters, in the PRPD's inadequate protective measures, and in the handling of his resignation and attempt to rescind it. The first transfer and the PRPD's allegedly defective security do not qualify as valid adverse employment actions. Accordingly, for any individual defendant to be liable in his personal capacity, Camacho must show a direct link between the defendant's actions and at least one of the two alleged adverse employment actions that do so qualify. For several of the individual defendants, there is insufficient evidence, even when viewed in the light most favorable to Camacho, to establish such a link.

#### 1.   Officers

The amended complaint connects Vázquez, Bermúdez, and Rivera Alicea to only one

alleged adverse employment action: harassment.[10]   But as defendants point out, the uncontested facts reveal that none of those officers personally harassed Camacho.   The only harassment evidenced in the record is the series of death threats against Camacho received, at some point, by General Headquarters.   There is no suggestion that any of the individual defendants made those threats.   Nor is there evidence that the threats came from officers subordinate to any of the individual defendants (or, indeed, from still-employed PRPD officers at all), such that it might be appropriate to hold the individual defendants liable on a supervisory liability theory.   Accordingly, because it is not possible to infer from the facts that they personally contributed to any adverse employment action, Vázquez, Bermúdez, and Rivera Alicea are entitled to summary judgment on Camacho's First Amendment claim.

## 2.   Associate Superintendent and Former Superintendents

Like the officer defendants, Associate Superintendent Rivera Díaz is named explicitly in the amended complaint only as a perpetrator of harassment, and Camacho admits that Rivera Díaz did not in fact personally harass him.   However, it appears that Rivera Díaz signed the letter informing Camacho that his resignation had been accepted. Therefore, to the extent the PRPD's handling of Camacho's resignation amounted to an adverse employment action—a question defendants fail to address—it remains a genuine issue whether Rivera Díaz's conduct directly contributed to it, and summary judgment based on the lack of a causal connection would be inappropriate.

Camacho does not personally connect Figueroa to any instance of harassment, and, as discussed, Figueroa cannot be held liable for harassment in a supervisory capacity because there is no evidence that the death threats made against Camacho came from active PRPD officers under Figueroa's control.   Figueroa also has no connection to the handling of

---

[10]  The complaint also alleges that Bermúdez "granted" or "approved" Camacho's letter rescinding his resignation. Amend. Compl. ¶¶ III.46–47.  It appears from Camacho's Local Rule 56 statement that the letter in fact was "endorsed" by "Bermúdez' office" or by "administrative chief Hector Figueroa, on behalf of Colonel Bermúdez."  Pl.'s SUMF ¶¶ 34, 37.  Regardless, Camacho does not appear to connect Bermúdez with the conduct actually complained of—that is, with the refusal to allow Camacho to rescind his resignation.

Camacho's resignation; he was no longer in power when the PRPD notified Camacho that his resignation had been accepted.  Camacho's First Amendment claim against Figueroa in his personal capacity is therefore dismissed.

Former Superintendent Díaz assumed office on July 6, 2011, one day after Camacho signed the letter rescinding his resignation.  Díaz could not have been personally involved in either Camacho's harassment or his transfer to General Headquarters, nor would it be appropriate to hold him liable for those potential adverse employment actions in a supervisory capacity.  As for the acceptance of Camacho's resignation, Camacho has failed to provide evidence that Díaz was personally involved.  Díaz did not sign the acceptance letter.  *See Velez-Rivera v. Agosto-Alicea*, 437 F.3d 145, 156 (1st Cir. 2006) ("Peña claims that Agosto canceled his contract.  However, . . . the letter terminating his contract was not signed by Agosto. . . . Peña has not alleged any facts to substantiate his claim that Agosto was directly involved.").  Nor can Díaz be held liable under a theory of supervisory liability, as Camacho has not shown an affirmative link between his conduct and that of Rivera Díaz or any other subordinate.  The First Amendment claim against Díaz in his personal capacity is therefore dismissed.

### 3.     Rivera Pabón

Camacho alleges that Rivera Pabón, as Director of Human Resources, "decided not to grant [Camacho's] revocation letter (although it was approved by Co-Defendant Col. Bermúdez), and to make his resignation effective retroactively on June 28, 2011 based on the fact that the [Superintendent] had not signed his resignation letter."  Amend. Compl. ¶¶ II.1.1, III.47.  In his Local Rule 56 statement, Camacho states that Rivera Pabón "proceeded to keep [his] resignation effective retroactively [*sic*] June 28, 2011."  Pl.'s SUMF ¶ 38.  Defendants take issue with Camacho's characterization of Rivera Pabón's role and actions on two grounds.  First, they assert that at the relevant time she was not the Director of Human Resources, but rather merely an analyst in that department.  Second, they assert that the record materials cited by Camacho do not support the conclusion that Rivera Pabón acted

on her own authority to reject Camacho's attempt to rescind his resignation and instead accept it effective June 28, 2011. The dispute over Rivera Pabón's precise position is a genuine one, though neither party makes clear why it matters. As for defendants' second objection, I agree that Camacho has not cited admissible evidence to support the assertion that Rivera Pabón was responsible for accepting his resignation. The material cited—the deposition of Rivera Alicea—supports only the inference that Rivera Pabón declined to process Camacho's letter rescinding his resignation because it had already been determined, by some other, presumably higher-ranking authority, that it would not be accepted, and that his initial resignation would be. *See* Docket No. 54-11, at 12. Camacho does not link Rivera Pabón to any other alleged adverse employment action. His First Amendment claim against her in her personal capacity therefore fails and is dismissed.

### C.  Protected Speech

Defendants next argue that Camacho's communications with the FBI did not constitute protected speech. In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court "clarified and expanded on" what it means for a public employee to speak on matters of public concern "as a citizen," *Curran v. Cousins*, 509 F.3d 36, 44–45 (1st Cir. 2007), effectively restricting the protection afforded to public employees by the First Amendment. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1068 (9th Cir. 2013) (noting that *Garcetti* "narrowed" the scope of First Amendment protection for employee speech); *Reilly v. City of Atlantic City*, 532 F.3d 216, 228 (3d Cir. 2008) (same). The Court recognized that "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti*, 547 U.S. at 417. But those rights must be qualified, because government "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity." *Id.* at 422. Accordingly, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

      Here, then, the question is whether Camacho's communications with the FBI about corruption within the PRPD were "pursuant to [his] official duties." This is a question of law that the court may decide on summary judgment, at least "where the material facts are not in dispute." *Foley v. Town of Randolph*, 598 F.3d 1, 5 n.8 (1st Cir. 2010) (citing *Gagliardi v. Sullivan*, 513 F.3d 301, 306 n.8 (1st Cir. 2008); *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)). Since there was no dispute in *Garcetti* itself that the plaintiff's speech was pursuant to his official duties, the Court did not "articulate a comprehensive framework for defining the scope of an employee's duties," instead emphasizing that the "proper inquiry is a practical one." *Id.* at 424. In trying to flesh out a more specific standard, the First Circuit has found guidance in phrases used by the Court throughout its opinion to describe the relevant class of speech. *See Decotiis v. Whittemore*, 635 F.3d 22, 30 (1st Cir. 2011). The Court referred to "speech that 'owes its existence to a public employee's professional responsibilities,' speech that the employer 'has commissioned or created,' speech that the employee 'was paid to' make, speech that the employee's 'duties . . . required him to' make, speech that amounts to the employee's 'work product,' and speech that is an 'official communication[].'" *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 27 n.9 (1st Cir. 2010) (quoting *Garcetti*, 547 U.S. at 421–23) (alteration and omission in original) (citations omitted).

      The Court also addressed certain factors that did not, at least individually, settle the issue. *See Foley*, 598 F.3d at 6 (citing *Garcetti*, 547 U.S. at 420–25). The fact that the plaintiff "expressed his views inside his office, rather than publicly, [was] not dispositive." *Garcetti*, 547 U.S. at 420. Nor was it dispositive that the plaintiff's speech "concerned the subject matter of [his] employment." *Id.* at 421. The Court also explicitly rejected the proposition that a public employee's official duties could be determined from a mere glance at his job description; were that the case, employers would be able to unduly limit their employee's rights through the imposition of overbroad internal guidelines. *Id.* at 424. "Formal job descriptions often bear little resemblance to the duties an employee actually is

expected to perform," the Court cautioned, "and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424–25.

Because the *Garcetti* inquiry is "so highly fact intensive and context specific," *Decotiis*, 635 F.3d at 26, my analysis of the issue is guided primarily by the several First Circuit cases squarely applying the Supreme Court's imprecise standard to their particular facts. *See Alberti v. Carlo-Izquierdo*, 548 F. App'x 625 (1st Cir. 2013), *cert. denied*, No. 13-1337 (U.S. Oct. 6, 2014); *O'Connell v. Marrero-Recio*, 724 F.3d 117 (1st Cir. 2013); *Decotiis*, 635 F.3d 22; *Mercado Berrios*, 611 F.3d 18; *Chamberlin v. Town of Stoughton*, 601 F.3d 25 (1st Cir. 2010); *Foley*, 598 F.3d 1; *Curran*, 509 F.3d 36.  Though I have already discussed some general lessons drawn from these decisions, it is useful to examine further the facts, and the court's reasoning, in each case.  I review them in turn.

In *Curran v. Cousins*, a corrections officer (Curran) alleged that the Sheriff's Department suspended him in retaliation for threatening statements he made to supervisors during an inquiry into a questionable sick day he had taken about a month earlier.  509 F.3d at 39–40, 44–46.  The court held, without much discussion, that the threats were not protected by the First Amendment: they were made not in Curran's capacity as a citizen, but "in the course of his duties within the Department, to his superiors, and during a discussion of official Department policy."  *Id.* at 45–46.

In *Foley v. Town of Randolph*, the court again found the plaintiff's speech unprotected.  598 F.3d at 8–9.  Foley, the chief of Randolph's fire department, alleged that he was suspended for criticizing the department during a press conference he held at the scene of a fatal fire.  *Id.* at 2–4.  Holding that it was "not dispositive that Foley was not *required* to speak to the media," the court emphasized that speech must be viewed in context in order to determine whether it was made pursuant to the speaker's official duties.  *Id.* at 6–7 (emphasis in original).  Similarly, it was not dispositive that Foley "expressed his views to

the public rather than within the workplace." *Id.* at 8. The court noted that "when a government employee answers a reporter's questions involving matters relating to his employment, there will be circumstances in which the employee's answers will take on the character of '[o]fficial communications.'" *Id.* (quoting *Garcetti*, 547 U.S. at 422) (alteration in original). Three factors, in particular, lent Foley's speech an official appearance: "Foley spoke while in uniform and on duty; he spoke from the scene of a fire where he had been in command as the Chief of the Fire Department; and his comments were bookended by those of another official—the State Fire Marshall." *Id.* It was also relevant that the speech "was entirely related to matters concerning the Fire Department." *Id.*

The issue in *Chamberlin v. Town of Staughton*, as here, was the cooperation by a police officer with an external investigation into police misconduct. 601 F.3d at 27–28. While serving as interim police chief, Chamberlin received information that several officers had engaged in criminal activity; in the course of investigating the allegations, he and his co-plaintiff Wohlgemuth, another high-ranking officer, conferred with the district attorney and a special prosecutor. *Id.* at 28. The court noted at the outset that *Garcetti* could be read to preclude virtually all First Amendment claims brought by police officers who spoke out about police misconduct, and that it was "unclear how far the Supreme Court intends to carry *Garcetti*." *Id.* at 30–31. But the *Chamberlin* court explicitly left open the question whether any police whistleblower claim could survive *Garcetti*, focusing only on the facts before it. The speech at issue was unprotected because, "[a]s two senior officers in the police department, it was within the scope of both plaintiffs' duties to cooperate with the district attorney and the special prosecutor in investigating the alleged criminal activity within the police department. Wohlgemuth shared responsibility for internal investigations, and Chamberlin had launched the investigation as part of his duties as chief." *Id.* at 35. Stressing the context- and fact-specific nature of its finding, however, the court cautioned that it was "not suggesting that *Garcetti* applies every time a police officer has conversations with a prosecutor. What constitutes official duties will necessarily vary with the circumstances

including the rank of the officer, his areas of responsibility and the nature of the conversations." *Id.*

The court again emphasized the importance of context in *Mercado-Berrios v. Cancel-Alegria*, separating the *Garcetti* question into two parts: "(1) what are the employee's official responsibilities? and (2) was the speech at issue made pursuant to those responsibilities?" 611 F.3d at 26. Mercado-Berrios worked for the Puerto Rico Tourism Company, a public corporation responsible for regulating and disciplining providers of tourism-related ground transportation. *Id.* at 20. After her supervisors instructed her to stop issuing citations to luxury vehicles not in compliance with safety regulations, she complained about the policy to co-workers, shift supervisors, and an attorney. *Id.* at 21. As in *Chamberlin*, the court observed that it was unclear how broadly *Garcetti* should be interpreted. It might be read narrowly, to mean "that unofficial communications that are not 'part of what [the plaintiff] . . . was employed to do,' like Mercado-Berrios's complaints, fall outside the scope of its rule" and remain protected under the First Amendment. *Id* at 27 (alteration in original) (quoting *Garcetti*, 547 U.S. at 421). Indeed, the *Garcetti* Court "did not expressly indicate that it meant to sweep more broadly and include, for example, all speech that relates to, contributes to, or incidentally facilitates the performance of official functions." *Id.*

At the same time, *Garcetti*'s holding was motivated at least in part by the recognition that government employers must be afforded latitude in employment decisions, a motivation that would support a less restrictive view. Other courts of appeals, the court noted, have construed *Garcetti* to deny protection to "all speech made 'during the course of performing an official duty' that 'reasonably contributes to or facilitates the employee's performance of [an] official duty.'" *Id.* (alteration in original) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007)) (citing *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007) (per curiam)). "On that view, complaints like Mercado-Berrios's might be unprotected, since they could be said to facilitate job performance by removing (or attempting to remove) an obstacle." *Id.* The D.C. Circuit took

precisely that position, holding that "a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." *Id.* (quoting *Winder v. Erste*, 556 F.3d 209, 215 (D.C. Cir. 2009)).  The court concluded that both parties had a strong argument as to the official character of the speech.  *Id.*  Because the defendant failed to brief the issue, however, the court affirmed the lower court's decision in Mercado-Berrios's favor without actually deciding the issue.

The First Circuit next applied *Garcetti* in *Decotiis v. Whittemore*, reviewing the district court's dismissal of the complaint for failure to state a claim.  635 F.3d at 26. Decotiis, a speech and language therapist, expressed to parent clients that her public employer, Child Development Services, was not in compliance with state regulations, and encouraged the parents to seek the aid of advocacy organizations. 635 F.3d at 26–27.  After considering several factors gleaned from a close reading of *Garcetti*, the court held that Decotiis's complaint plausibly alleged that the speech was made in her capacity as a citizen. *Id.* at 35.  Decotiis's speech was "not made 'pursuant to' her job duties in the most literal sense." *Id.* at 32 (quoting *Mercado-Berrios*, 611 F.3d at 27).  Though her communications with parents concerned the general subject matter of her job, it was clear that her employer did not ask or expect her to make them, and "[n]othing in *Garcetti* or the decisions interpreting it can fairly be read to suggest that all speech tangentially or broadly relating to the work of a public employee is per se unprotected."  *Id.* at 32–33.

The court then attempted to put the speech in context, asking whether Decotiis spoke to the parents in her office, whether the speech was made during work hours, whether the speech "bore the appearance of official status or significance," *id.* at 33, and whether the speech reflected "special knowledge" particularly attributable to her work.  *Id.* at 34 (quoting *Williams*, 480 F.3d at 694).  Given the posture of the case, the court could consider only the allegations in the complaint, which did not clearly provide an answer to those questions.  *Id.* Viewing the alleged facts in Decotiis's favor, it was unable to conclude that Decotiis spoke

with parents in her office or while on the job, that parents were led to believe that she spoke on her employer's behalf, or that the subject matter of her speech "was confined to information she had obtained through her employment." *Id.* at 33–34. Finally, the court looked to whether the speech had a "citizen analogue." *Id.* (citing *Garcetti*, 547 U.S. at 423). Again drawing inferences in Decotiis's favor, it found that her speech was sufficiently analogous to that of the concerned "parents . . ., advocacy groups, therapists, professional associations, and lawyers" discussing the same issues about which she spoke. *Id.* at 34. Though the court was unable to "conclusively say that [Decotiis's] speech was made as a citizen," it found that the district court's dismissal of her complaint was in error. *Id.* at 34–35.

In *O'Connell v. Marrero-Recio*, O'Connell, Human Resources Director for the Puerto Rico Permits and Regulation Administration, told her superiors that she refused to engage in personnel actions she viewed as illegal and unethical. 724 F.3d at 120–123. The court held that her speech "solely focused on events at her workplace and was made exclusively to fulfill her [official] responsibilities . . . . This type of communication is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment." *Id.* at 123 (citing *Garcetti*, 547 U.S. at 421–22; *Foley*, 598 F.3d at 7–8).

The First Circuit's most recent dip into *Garcetti*'s muddied waters came in *Alberti v. Carlo-Izquierdo*. Alberti was a professor at the University of Puerto Rico and the director of the School of Nursing's family nurse practitioner ("FNP") program. 548 F. App'x at 634. She "bypassed the chain of command" and wrote a letter to the Chancellor of the school's Medical Science Campus complaining about one of her students, who she claimed had violated the Health Insurance Portability and Accountability Act ("HIPAA"), and about fellow faculty members, who she claimed were interfering with her work as director of the FNP program. *Id.* The court found it clear that Alberti's speech was made pursuant to her official duties. *Id.* at 638. Her complaints were "made in her supervisory capacity over [the

student], as her teacher, and in her capacity as FNP program directory, concerning the administration of the FNP program." *Id.*  The court found particularly relevant the fact that "Alberti signed the letter as FNP director, and it pertained to issues regarding the administration of the FNP program."  *Id.* at 639.

Having considered the First Circuit's application of *Garcetti*, as well as the approaches of other courts, I conclude that the extent of Camacho's official duties remains a genuine issue of material fact, and defendants therefore have failed to show that Camacho's speech was unprotected as a matter of law.  The record does not conclusively establish whether Camacho had a duty, as a PRPD officer, to report corruption within the police force to an outside law enforcement agency such as the FBI.  Defendants rely on the Puerto Rico Police Act, which states that the police have, among others, the duty to "prevent, discover, investigate, and persecute crime." 25 L.P.R.A. § 3102.  As they see it, that statute imposed on Camacho the duty to take steps necessary to rid the PRPD of corruption, including, if necessary, reporting the corruption to an appropriate outside agency.  Camacho, for his part, points to two more specific descriptions of his duties: internal PRPD bylaws, which make no mention of any duty to report crime or otherwise cooperate with external agencies, and a PRPD general order reciting the basic responsibilities of members of the Tactical Operations Division, which again does not address the issue of cooperation.

Both parties thus draw inferences in their own favor from sources that do not explicitly say that there is or is not a duty to cooperate with or inform the FBI of police corruption.  But for purposes of defendants' motion for summary judgment, Camacho is entitled to all reasonable favorable inferences.  I therefore conclude that these various job descriptions do not affirmatively establish a formal duty to refer police misconduct to the FBI.  At the same time, however, they do not establish, as Camacho urges, that there is no such duty.  It is not reasonable to infer from the material cited by Camacho that PRPD officers generally, or members of the Tactical Operations Division in particular, have absolutely no affirmative responsibilities beyond those expressly enumerated.

Regardless, "the scope of an employee's duties for First Amendment purposes may not necessarily be determined by the employee's formal job description, as '[formal job descriptions often bear little resemblance to the duties an employee is actually expected to perform.'" *Foley*, 598 F.3d at 6 (quoting *Garcetti*, 547 U.S at 424–25). The parties have provided no more specific evidence as to whether Camacho, or any other PRPD officer, was "actually expected" to report police corruption to the FBI. *Compare, e.g.*, *Livingston v. Bartis*, No. 4:06-CV-1574 (JCH), 2008 WL 185791, at *8 (E.D. Mo. Jan 18, 2008) (finding genuine issue as to official duties given, first, written policy prohibiting officers from sharing with persons outside department any information learned in connection with employment and, second, evidence that no officer other than plaintiff had reported misconduct to an external agency in 22 years), *and Batt v. City of Oakland*, No. C 02-04975 MHP, 2006 WL 1980401, at *4 (N.D. Cal. July 13, 2006) (plaintiff officer presented evidence demonstrating an unwritten institutional policy *not* to report police misconduct, contrary to the letter of his job description), *with Watts v. City of Jackson*, 827 F. Supp. 2d 724, 730 (S.D. Miss. 2011) (evidence that "JPD officers cooperate with the FBI on a weekly basis" corroborated written job description requiring cooperation with outside agencies), *and Cheek v. City of Edwardsville*, 514 F. Supp. 2d 1220, 1231 (D. Kan. 2007) ("[T]he summary judgment record establishes that the Edwardsville police department routinely sought assistance from outside agencies in appropriate circumstances.").

It is clear, at least, that Camacho's communications with the FBI were not made pursuant to his duties "in the most literal sense," *Decotiis*, 635 F.3d at 32, in that he was not ordered to make them. But neither that fact nor the lack of evidence regarding PRPD policy puts an end to the inquiry. I must determine whether the facts before me show that Camacho was speaking pursuant to an official duty notwithstanding the lack of direct evidence on that point. *See id.* at 32 (citing *Foley*, 598 F.3d at 7) ("To determine whether . . . speech was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech.").

There can be no legitimate argument that Camacho's speech "bore the appearance of official status or significance." *Decotiis*, 635 F.3d at 33. Unlike the media in *Foley*, Camacho's audience had no reason to believe that he was speaking on behalf of his employer. On the contrary, Camacho appeared to be decidedly off-message. Not only was he reporting the misconduct of his fellow officers, but by speaking with the FBI directly, he was bypassing the normal chain of command. And though going over the heads of direct supervisors does not necessarily result in First Amendment protection, *see Alberti*,[11] 548 F. App'x at 634, 638–39, the fact that a public employee broke protocol suggests that he was not acting according to the mandates of his employer. Indeed, the court in *Decotiis* identified "whether the speech was made up the chain of command" as a relevant question, 635 F.3d at 32 (citing *Garcetti*, 547 U.S. at 420), and in *Curran*, the court found no First Amendment protection in part because the plaintiff's speech was made "to his superiors." 509 F.3d at 46. *See also Dahlia*, 735 F.3d at 1074 ("[P]articularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not dispositive, factor in determining whether he spoke pursuant to his official duties. When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties.").

*Decotiis* identified "whether the speech was made up the chain of command" and whether it "bore the appearance of official status or significance" as two separate factors. But they tend to overlap when, as here, the audience knows that the speaker is not following standard procedure. Surely the FBI, which has its own task force at the PRPD and could easily have proceeded through official channels, was not "led to believe that [Camacho] was speaking on behalf of [the PRPD]." *Id.* at 34. Operation Guard Shack was, for the most part, apparently run through the PRPD's FBI task force. *See* Defs.' SUMF ¶¶ 54–57. The

---

[11] Even in *Alberti*, though the plaintiff claimed to have bypassed the chain of command, apparently by skipping over her immediate superiors, she still addressed her complaints to the Chancellor of her university.

FBI simply could not have considered Camacho, secretly recruited off the books to supplement the joint investigation, to be a mouthpiece for the PRPD.

At least with respect to his initial meeting and communication with the FBI at CompUSA (as opposed to the regular reports that followed), it is true that Camacho did not exactly bypass the chain of command; rather, he told the FBI about police corruption in response to an unsolicited inquiry from non-PRPD agents. Nevertheless, the fact that this first instance of speech was prompted by a request from an outside agency that came while Camacho was off the job—rather than an official inquiry directed at Camacho through the PRPD—also suggests that the speech was not pursuant to a formal PRPD-imposed duty. *Watts v. City of Jackson* is not, as defendants contend, to the contrary. There, the court noted that the fact that the plaintiff officer was approached by the FBI, rather than reporting police misconduct of his own initiative, distinguished his case from those "exploring *Garcetti* in the context of whistle-blowers who discover maleficence and externally report it with no official duty to do so." 827 F. Supp. 2d at 731 (citing *Davis v. McKinney*, 518 F.3d 304, 314 (5th Cir. 2008)). But the *Watts* court had already determined that the plaintiff "had a specific job requirement to cooperate with, and provide information to, the FBI when contacted." *Id.* Because the evidence here does not show an equivalent requirement, the fact that the FBI initiated the relationship does not support the proposition that Camacho spoke pursuant to an official duty.

There is no suggestion in the record that Camacho spoke with the FBI in order "to facilitate job performance by removing (or attempting to remove) an obstacle," *Mercado-Berrios*, 611 F.3d at 27, as was the case in *O'Connell*, *Alberti*, and, arguably, *Mercado Berrios*. It does not appear that Camacho informed the FBI of PRPD corruption because the transgressions of his fellow officers were preventing him from effectively performing his duties. While Camacho may have been motivated to participate in Operation Guard Shack out of a broad concern that the PRPD's institutional infirmities were keeping it from its role as blameless protector, defendants can point to no evidence that he believed his own efficacy

to be in jeopardy. This is not a case where speech, though not directly required by an official duty, is brought within the *Garcetti* exception as necessary to the proper performance of duties that are in fact required.

There are some questions about the speech's context left unanswered by the record. It is unclear, for example, where and when Camacho communicated with the FBI after their initial meeting. *See Decotiis*, 635 F.3d at 33 (identifying as relevant factors whether the speech was made in the plaintiff's office and whether the plaintiff spoke during work hours). The parties agree that Camacho "did his work as an undercover FBI agent while he was on duty as a police officer and within his work schedule."[12] Defs.' SUMF ¶ 21. But it is unclear whether this "work" includes Camacho's communications with the FBI—that is, his actual speech—as well as the acts required to uncover information he reported. As in *Decotiis*, I draw the inferences most favorable to Camacho. *See id.* at 33–34. It is eminently plausible (indeed, likely, considering that he worked with the subjects of his reports) that Camacho relayed to the FBI the information he uncovered during his off hours, and that he did not do so from his office. In any case, there is no question that the initial meeting, when Camacho informed the FBI of PRPD corruption and agreed to participate in Operation Guard Shack, took place CompUSA while Camacho was working there part-time (and therefore not while he was on duty as a police officer).

*Decotiis* also asked whether the plaintiff's "speech was confined to information she had obtained through her employment, that is, whether her speech reflected 'special knowledge' attributable to her work." *Id.* at 34 (quoting *Williams*, 480 F.3d at 694). The parties agree that Camacho had access to the information he reported to the FBI at least in part because of his job as a police officer. But to find unprotected all speech involving matters known to the speaker by virtue of his employment would be to read *Decotiis* and *Garcetti* too broadly. At issue in *Decotiis* was the employer's failure to comply with state

---

[12] Camacho objects to his characterization as an "undercover FBI agent" but admits that he "was on duty as a police officer when he gathered information for Operation Guard Shack." Pl.'s OSMF ¶ 21.

regulations, *id.* at 26, information that the plaintiff clearly became aware of by virtue of her employment.  Still, the court found that the employer's questionable policies "had generated consternation . . . throughout the state.  In light of this, it is reasonable to infer that such concern was the subject of public discussion and that Decotiis's knowledge was therefore publically available and not unique to her and those in her employment position."  *Id.* at 34.  The question, then, is not merely whether Camacho knew of police misconduct by virtue of his position; it is, rather, whether only he or someone with the same job could possibly possess that particular knowledge.  This narrow reading is consistent with *Garcetti*, where the Court noted that speech "concern[ing] the subject matter of [a plaintiff's] employment" is not necessarily speech made pursuant to an official duty.  547 U.S. 421.  A rule denying First Amendment protection to *all* speech "obtained through [a plaintiff's] employment" would render this distinction toothless.

Here, the uncontested facts do not reveal the precise information conveyed by Camacho to the FBI.  At the initial meeting, agents "inquired about any knowledge [Camacho] had of illegal activities taken by fellow police officers at the PRPD, to which [he] replied in the affirmative."  Pl.'s SUMF ¶ 3.  Though not entirely clear, it can be reasonably inferred that Camacho told the agents about specific acts of misconduct (as opposed to, more generally, that he was in fact aware of illegal activities).  The parties do not identify those acts, or explain how Camacho knew of them, but they were likely similar to the activities that Camacho subsequently participated in and reported to the FBI.  Camacho reported information he acquired while "posing as a corrupt police officer who imported and sold kilos of cocaine in the PRPD, offering fellow PRPD officers large sums of money on behalf of local drug-dealers in exchange for assistance in transporting the drug and providing armed protection during drug transactions."  Pl.'s SUMF ¶ 4.  While it appears that these particular drug transactions were shams, controlled exchanges set up and monitored by the FBI, *see* Docket No. 54-5, at 13, it is reasonable to assume, at this stage, that Camacho initially informed the FBI of instances where his fellow officers participated in similar activities with

actual criminals.  At least some of the information conveyed outside CompUSA, then, was likely known by persons outside the PRPD—the criminals in business with Camacho's corrupt colleagues.  If so, the information at issue was, as in *Decotiis*, "not unique to [Camacho] and those in [his] employment position."  635 F.3d at 33.

Similarly, the facts permit the inference that Camacho's speech has a "citizen analogue."  *Id.*  In *Decotiis*, the court's conclusion that the plaintiff may have spoken "as a citizen" was bolstered by the fact that "parents of children, advocacy groups, therapists, professional associations, and lawyers were all discussing the issues about which she spoke." *Id.* at 34.  Here, Camacho participated in Operation Guard Shack "as a cooperator or informant for the FBI."  Pl.'s SUMF ¶ 14.  The FBI could have, and perhaps did, secure information similar to Camacho's from non-police informants.  The fact that Camacho's speech has a citizen analogue—the typical, non-police informant or cooperator—further saps the strength of defendants' contention that he did not speak as a citizen as a matter of law.

Camacho's rank provides further context for his speech.  Though the facts do not specify exactly what rank he held, it does not appear that he possessed any supervisory power, and this lack of authority distinguishes the instant case from *Chamberlin*.  There, one plaintiff was serving as interim police chief when he began looking into allegations of police misconduct; the other, a lieutenant, was responsible for internal investigations.  601 F.3d at 28, 35.  It is reasonable to find that high-ranking officers with supervisory responsibilities have an implicit duty to investigate and report the transgressions of their coworkers.  *See id.* But Camacho, apparently, was not such an officer.

Even assuming, for the sake of argument, that Camacho had a comparable duty, it is unlikely, given his rank, that he was bound to report misconduct to the FBI, as opposed merely to his superiors.  The interim police chief in *Chamberlin* was the highest authority within the police department, so it was appropriate for him to report his findings externally. Other courts have also focused on the plaintiff's high rank in finding that speech made to individuals or entities outside the police, rather than up the chain of command, was pursuant

to an official duty.  *See Patterson v. City of Earlington*, 650 F. Supp. 2d 674, 680 (W.D. Ky. 2009) (chief of city police's reports to state police were made to "most appropriate authority"); *Mantle v. City of Country Club Hills*, No. 4:07-CV-055 (CEJ), 2008 WL 3853432, at *4 (E.D. Mo. Aug. 15, 2008) ("Judge Bucholz was simply the most appropriate authority to whom to make a report.  Being the Chief of Police, plaintiff had no departmental supervisor to whom he could pass along his information.").  Camacho could have reported the misconduct of his fellow officers to his superiors within the PRPD.  To the extent his general obligations as a police officer required him to take some action, it is not reasonable to conclude, given his rank, that he was also required to sidestep the chain of command.

Citing *Watts*, defendants make three final arguments.  First, they point out that "there were other police agents who were also FBI informants at the time [Camacho] did his undercover work."  Defs.' Mot. 17.  In *Watts*, the court found it relevant that "more than a dozen" other officers also communicated with the FBI because the "participation of so many JPD officers in this investigation demonstrates that the duty to cooperate and disclose information found in the JPD manual was applied to this very investigation." 827 F. Supp. 2d at 731.  But the fact that Camacho was not alone does not help defendants. Not only were there far fewer officers involved here than in *Watts*, there is no explicit policy of cooperation that the participation of other officers might serve to corroborate.

Second, defendants argue that Camacho's receipt of between $50,000 and $60,000 from the FBI demonstrates that he acted pursuant to an official duty.  The *Watts* court indeed based its decision in part on the fact that at least some of the officers involved were compensated for their cooperation.  *See id.*  And *Garcetti* referred to "speech that the employee 'was paid to' make" as speech constituting the performance of official duties. *Mercado-Berrios*, 611 F.3d at 27 n.9 (quoting *Garcetti*, 547 U.S. at 422).  It makes perfect sense to classify paid speech as speech made pursuant to an official duty—but only when the

speaker is compensated by his *employer*.[13]  It is immaterial that the FBI gave Camacho money, even if, as Camacho denies, it was intended as compensation for the information he provided.

Finally, defendants latch onto *Garcetti*'s pronouncement that "speech that owes its existence to a public employee's professional responsibilities" is unprotected as pursuant to the employee's official duties.  547 U.S. at 421.  But like the language in *Decotiis* asking whether the plaintiff's speech "was confined to information [he] had obtained through [his] employment," 635 F.3d at 34, this phrase must not be stretched to its theoretical limit.  It cannot be that *all* speech that would not exist but for the fact of its speaker's employment is unprotected by the First Amendment.  Such a standard would make it impossible for a plaintiff to prevail on a retaliation claim when his speech even remotely concerns his job.  That is manifestly not what the *Garcetti* Court had in mind.  In context, *Garcetti*'s "owes its existence" language is merely an attempt to describe speech made pursuant to one's official duties without using those words.  The question remains whether Camacho had an official duty to speak to the FBI in the manner he did, and the answer remains uncertain.

### D.    Qualified Immunity

Notwithstanding their failure to prevail on the issue of protected speech, all individual defendants are entitled to qualified immunity from Camacho's First Amendment claim in their personal capacities.

 Government officials are immune from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This immunity is available only to officials sued in their personal capacity.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Because the doctrine of qualified immunity "provides defendant

---

[13] Admittedly, *Watts* did not make clear whether the officers were compensated by the police department or by the FBI.  To the extent that it stands for the proposition that compensated speech is likely pursuant to an official duty no matter who paid for it, I find *Watts* unpersuasive.

public officials from immunity from suit and not a mere defense to liability," the issue of immunity is properly resolved at summary judgment or an earlier stage of litigation. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (citing *Hunter v. Bryant*, 502 U.S. 635, 640 n.2 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  There are two parts to the qualified immunity inquiry.  *Id.* at 269 (citing *Pearson v. Callahan*, 129 S. Ct. 808, 815–16 (2009)).  The first question is "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right."  *Id.*  If so, the court must then determine "whether the right was 'clearly established' at the time of the defendant's alleged violation."  *Id.*

There are, in turn, two aspects to the "clearly established" analysis.  The first concerns how clearly, as a general matter, the "contours of the right" are delineated; the right must be clear enough that a reasonable official would understand "that what he is doing violates that right."  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The second is more granular, focusing on "the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights."  *Id.*  Considering both these aspects together, the ultimate question is "whether the state of the law at the time of the alleged violation gave the defendant fair warning that this particular conduct was unconstitutional."  *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The two steps of the qualified immunity analysis need not necessarily be tackled in sequence.  *Pearson*, 129 S. Ct. at 818.  "Courts have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right."  *Maldonado*, 568 F.3d at 270.  It may be inefficient to decide whether a violation occurred when that decision will have "no effect on the outcome of the case."  *Id.* (quoting *Pearson*, 129 S. Ct. at 818).  This is especially likely where the constitutional violation issue is particularly fact-dependent, diminishing the potential precedential value of a full-fledged analysis.  *Id.* (citing *Pearson*, 129 S. Ct. at 819).  Similarly, "where the answer to the first prong of the immunity question may depend on

further development of the facts, it may be wise to avoid the first step." *Id.* (citing *Pearson*, 129 S. Ct. at 819; *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006)).

Here, it is appropriate to proceed directly to the second step: whether the right was clearly established at the time of the alleged violation. A decision as to whether Camacho's First Amendment rights were in fact violated would be heavily fact-dependent, and many of the facts at issue are less than perfectly clear. And because I conclude that defendants did not have fair warning that their conduct was unconstitutional, they would be entitled to qualified immunity whether or not there was a constitutional violation at all.

For the court to determine that a constitutional right was clearly established, "there does not need to be a prior case with factually identical circumstances finding such a right." *Decotiis*, 635 F.3d at 37 (citing *Mosher v. Nelson*, 589 F.3d 488, 493 (1st Cir. 2009)). The overall "state of the law at the time" may provide a defendant with fair notice that his conduct is unconstitutional even though "notable factual differences may exist between prior cases and the circumstances at hand." *Id.* (quoting *Mosher*, 589 F.3d at 493). But the burden rests on the plaintiff to "point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with 'fair warning.'" *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

Camacho has not met this burden. As apparent from the discussion above, the contours of *Garcetti* are not clearly defined; they were murkier still in 2011, when the relevant conduct occurred. Of course, *Garcetti* clearly established that public employers generally may not retaliate against an employee for speech made as a citizen on a matter of public concern. But "[e]ven though the broad constitutional rule . . . may have been clearly established, the contours of the right were still cloudy" at the relevant time. *Id. Garcetti* did not articulate a clear standard for determining whether an employee spoke as a citizen or, instead, pursuant to his official duties. Though subsequent decisions in this circuit and others applied the *Garcetti* analysis to their particular facts, the resulting body of case law was still too fragmented to have signaled unequivocally that Camacho's speech was

protected.

At the time of defendants' conduct, the First Circuit had squarely addressed *Garcetti* five times. As discussed, in *Curran*, *Foley*, and *Chamberlin*, the court found the speech at issue unprotected as made pursuant to the plaintiffs' official duties. In *Mercado-Berrios*, the court affirmed the district court's finding of protected speech because the defendant had failed to properly brief the issue on appeal. The court did not express a view on the merits; instead, it noted that *Garcetti*'s scope was uncertain and that both sides had plausible arguments. In *Decotiis*, the court held that the complaint alleged facts plausibly setting forth citizen speech, but was careful to note that it did not conclusively find the plaintiff's speech protected. Its holding was a product of its obligation to view the facts alleged in the light most favorable to the plaintiff.

The First Circuit had thus never applied *Garcetti* and concluded decisively that the speech at issue was protected, and defendants therefore had no clear example of speech *not* made pursuant to official duties. Nor did they have a broad, easy-to-apply standard; because of the intensely fact-specific nature of the *Garcetti* inquiry, the First Circuit's decisions were of limited utility the further one strayed from their particular facts. Take, for example, *Chamberlin*, the First Circuit case factually closest to this one. There, the court declined to decide whether a police officer's communications with an outside agency could ever qualify as protected speech, holding only that the plaintiff's speech was made pursuant to his official duties given his "rank . . ., his areas of responsibility and the nature of the conversations." 601 F.3d at 35. A police department considering retaliation against an employee could be sure the employee's speech was unprotected only if the relevant facts were more or less the same as in *Chamberlin*. Change one of the three factors identified by the court and the outcome is uncertain.

At the relevant time, the majority of other courts applying *Garcetti* to similar facts had also found the police officer's extra-department speech unprotected. *E.g.*, *Garner v. City of Cuyahoga Falls*, 311 F. App'x 896 (6th Cir. 2009); *Huppert v. City of Pittsburg*, 574 F.3d

696, 707 (9th Cir. 2009), *overruled by Dahlia*, 735 F.3d 1060; *Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007); *Patterson*, 650 F. Supp. 2d 674; *Guthrie v. Bradley*, Civil Action No. 06-0619, 2008 WL 4279805 (W.D. Pa. Sept. 15, 2008); *Wiess v. Vill. of Brooklyn*, No. 08-cv-473-JPG, 2008 WL 4200610 (S.D. Ill. Sept. 9, 2008); *Mantle*, 2008 WL 3853432; *Cheek*, 514 F. Supp. 2d 1220. *But see, e.g., Livingston*, 2008 WL 185791 (partially denying summary judgment because there remained a genuine issue of material fact as to whether officers' statements to the FBI were made pursuant to their official duties). There was thus not "a body of decisions from other circuits that could be said to have put [defendants] on clear notice" that retaliating against Camacho would violate his First Amendment rights. *Decotiis*, 635 F.3d at 37.

In sum, it remains a genuine issue of material fact whether Camacho's speech was protected by the First Amendment such that defendants' retaliation would constitute a constitutional violation. Regardless, defendants are entitled to summary judgment on the ground of qualified immunity. The First Amendment claims against the individual defendants in their personal capacities are dismissed.

## III.    Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides that a state may not deprive a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Puerto Rico is considered a state for Fourteenth Amendment purposes. *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 599 (1976). While the Due Process Clause "has both substantive and procedural components," *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006), only the latter is implicated here. To make out a procedural due process claim, a "plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *González-Droz v. González-Colón*, 660 F.3d 1, 13 (1st Cir. 2011) (alteration in original) (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)).

Protected property interests are created not by the Constitution, but "by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).   A plaintiff whose due process claim is premised on the termination of his employment "must demonstrate that [he] has a legally recognized expectation that [he] will retain [his] position." *Santana v. Calderón*, 342 F.3d 18, 24 (1st Cir. 2003).   Such an expectation may "derive from a statute, a contract provision, or an officially sanctioned rule of the workplace." *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593, 601–02 (1972)).   A state may not "discharg[e] a public employee who possesses a property interest in continued employment without due process of law."   *Id.* at 23 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)).   Generally, due process is satisfied if the plaintiff is provided with notice and a meaningful opportunity to be heard. *See Loudermill*, 470 U.S. at 542.

### A.    Personal Involvement of Individual Defendants

As discussed above in the context of his First Amendment claim, Camacho has failed to produce evidence connecting all individual defendants except Associate Superintendent Rivera Díaz to what he characterizes as his termination.   According to defendants, Rivera Díaz signed the letter informing Camacho of his effective resignation, but there is no evidence that any other individual defendants were personally involved in the decision to accept Camacho's resignation and remove him from the PRPD's system.   Accordingly, Camacho's due process claims against all individual defendants in their personal capacities are dismissed on this ground, with the exception of the claim against Rivera Díaz.

### B.    Deprivation of a Protected Property Interest

Defendants do not deny that Camacho had a protected property interest in his job. Under Puerto Rico law, public "career employees" may be discharged only for cause, *see* 3 L.P.R.A. § 1462e, and therefore "have a protected property interest in continued employment in [their] positions." *Costa-Urena v. Segarra*, 590 F.3d 18, 27 (1st Cir. 2009). PRPD officers such as Camacho are qualifying "career employees."   25 L.P.R.A. § 3102.

Instead, defendants argue that Camacho suffered no deprivation because he was not dismissed.  As defendants see it, the story is simple: Camacho voluntarily tendered his resignation, and the PRPD accepted it.  Camacho apparently does not dispute that the letter he received on August 31, 2011, functioned as an acceptance of his initial resignation.  He takes issue, however, with the fact that it was not signed by Díaz himself.  Camacho argues that, since only the Superintendent is authorized to accept or reject resignations, the PRPD's acceptance of his resignation was defective, and that his removal from the PRPD system therefore amounted to a dismissal without constitutionally adequate process.

### 1.    Failure to Comply with Regulations

Camacho attempts to conjure a due process violation from the PRPD's failure, in handling his resignation, to comply with state law and its own regulations.  He points to § 14.8 of the PRPD Staff Bylaws, which provides that the Superintendent must accept or reject an employee's resignation within 15 days.  Docket No. 93-2, at 4.  Strangely, Camacho takes no issue with the fact that it took well over 15 days for his resignation to be accepted, arguing only that the acceptance was defective because it did not come from the Superintendent.  Under § 14.8, Camacho reasons, only the Superintendent may accept or reject resignations, and though the Associate Superintendent is empowered by statute to assume the Superintendent's duties in the event the latter is absent from office or temporarily disabled, 25 L.P.R.A. § 3106(a), Díaz was present and fully able to perform his duties when the acceptance letter issued.

There are two problems with Camacho's argument.  First, as defendants note, Camacho has failed to read in full the statute defining the powers and duties of the Associate Superintendent.  It provides that the Superintendent has broad discretion to delegate his duties to the Associate Superintendent, "including those expressly entrusted to the Superintendent by law."  25 L.P.R.A. § 3106(b).  It is not explicit in the record but may be readily inferred that Rivera Díaz's acceptance of Camacho's resignation was an exercise of properly delegated authority.

Second, Camacho would not necessarily be entitled to summary judgment even if his resignation was accepted in a manner not authorized by state law and PRPD regulations. It is not a constitutional mandate that only the PRPD Superintendent accept or reject resignations; the "Due Process Clause does not incorporate the particular procedural structures enacted by state or local governments." *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 10 (1st Cir. 2003) (citing *O'Neill v. Baker*, 210 F.3d 41, 49 n.9 (1st Cir. 2000)). Camacho may premise his claim only on "those violations of state law that may have resulted in the deprivation of [his] due process rights." *O'Neill*, 210 F.3d at 49 n.9.

As discussed more particularly below, either Camacho voluntarily resigned or he was, in effect, fired. In neither case does it make a difference whether his resignation was accepted by the Superintendent or by a janitor. If he voluntarily resigned, "he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988), *cited with approval in Monahan v. Romney*, 625 F.3d 42, 47 (1st Cir. 2010). And if he did not voluntarily resign, he suffered a deprivation no matter who decided to accept his resignation.

Camacho also argues that the PRPD failed to comply with regulations when it considered his resignation despite his own failure to follow the convoluted procedures set forth in General Order No. 79-6. He did not submit his notice of resignation to his immediate supervisor for approval, fill out Form PPR-210 certifying that he had no ongoing obligations to the PRPD, and submit the approved notice and completed form to the Director of the Personnel Bureau to be forwarded to the Superintendent. Instead, he simply wrote a letter to the Superintendent and delivered it to Human Resources. But these regulations are for the PRPD's benefit, not that of resigning employees; surely the PRPD could in its discretion waive the requirements of General Order No. 79-6 and consider a resignation submitted in a technically improper manner. In any case, because the PRPD's failure to comply with its own regulations does not by itself implicate the Due Process Clause,

Camacho may not rely on this procedural irregularity to show that he was deprived of his property interest in continued employment.  Summary judgment for Camacho on that ground is therefore denied.

### 2.        Resignation or Dismissal?

As defendants see it, because Camacho resigned voluntarily, he was not entitled to any process before being separated from his employment.  It is true that a voluntary resignation does not constitute a constitutional deprivation.  *Monahan*, 625 F.3d at 47.  But neither party squarely addresses what seems to me the most important question surrounding Camacho's departure from the PRPD: did he effectively rescind his resignation prior to its acceptance?  On June 8, 2011, he wrote to the Superintendent that he was resigning effective June 28.  On June 27, he wrote another letter changing the effective date to September 5.  This letter also provided that if the Superintendent did not accept the new effective date, the original notice of resignation was to be disregarded; essentially, then, the June 27 letter functioned as both a withdrawal of the initial resignation and a new notice of resignation with a new effective date.  Finally, on July 5, Camacho submitted a third letter rescinding his resignation without qualification.  If Camacho properly rescinded his resignation, there was no resignation for the PRPD to accept, and removing Camacho from the system constituted a dismissal for which constitutionally adequate process was required.

Defendants suggest that Camacho had no unilateral right to rescind his resignation, characterizing his second and third letters as "attempts" to rescind subject to acceptance by the PRPD.  *See* Defs.' Mot. 20.  Whether an employee, public or otherwise, has a right to rescind his resignation is a matter of state law.  *See, e.g.*, *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 975 (9th Cir. 2002) (under California law, employee may rescind resignation prior to acceptance); *Koltonuk v. Borough of Laureldale*, 443 F. Supp. 2d 685, 693 (E.D. Pa. 2006) (same under Pennsylvania law).  But defendants' motion is devoid of any reference to Puerto Rico law on rescinding resignations; they do not explain why Camacho was not entitled to rescind his resignation unilaterally.  Citing five out-of-circuit cases, they state

simply that that "[r]efusal to accept an attempt to rescind a resignation and subsequent termination without process does not constitute a violation."  Defs.' Mot. 20 (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.* (*Brammer-Hoelter II*), 602 F.3d 1175 (10th Cir. 2010); *Cross v. Monett R-I Bd. of Educ.*, 431 F.3d 606 (8th Cir. 2005); *Ulrich*, 308. F.3d 968; *Graehling v. Village of Lombard*, 58 F.3d 295 (7th Cir. 1995); *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546 (11th Cir. 1992)).

        Not one of the cases upon which defendants rely supports this proposition.  In *Cross*, *Graehling*, and *Ulrich*, the plaintiffs attempted to rescind only after their resignations had been officially accepted.  While those cases found no constitutional violations on their particular facts, they did not hold that an employee may never unilaterally rescind his resignation.  Indeed, in *Ulrich*, as noted above, the court suggested that if the plaintiff had rescinded his resignation prior to its acceptance, his employer could not have terminated him without due process. 308 F.3d at 975.  *Hardy* was not a due process case; the plaintiff's § 1983 claim had been dismissed by the district court, and the sole issue on appeal was whether the lower court had erred in exercising jurisdiction over the plaintiff's state law claims.  In a footnote, however, the court noted that the plaintiff had resigned from his job but subsequently rescinded his resignation.  954 F.2d at 1546 n.2.  Far from stating that an employee may not rescind his resignation without his employer's approval, the court seemed to take as given that resignations are not set in stone.  Defendants submit that the rescission in *Hardy* was effective only because the plaintiff's employer told him he could rescind his resignation before its effective date, but there is no basis whatsoever for such a reading.  In fact, the plaintiff was told of the possibility of rescinding his resignation by his union representative, not his employer.  *Id.*  And while it is likely reasonable to assume that he rescinded his resignation before its effective date, the opinion does not specify the timing of the resignation and rescission.

        In *Brammer-Hoelter II*, the court noted it had held in a previous disposition that the defendants "did not violate [the plaintiffs'] rights by declining to accept their attempts to

rescind their resignations." 602 F.3d at 1180 (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.* (*Brammer-Hoelter I*), 492 F.3d 1192 (10th Cir. 2007)). In that previous opinion, the court found no due process violation because the plaintiffs were at-will employees and also denied the plaintiffs' breach of contract claim. Because the plaintiffs' employment contracts did not require their employer's acceptance to make a resignation effective, the court reasoned, their resignations were effective immediately upon being tendered, and they were therefore not entitled to rescind them without their employer's acquiescence. *Brammer-Hoelter I*, 492 F.3d at 1211.

Here, Camacho's resignation was at least arguably not effective upon receipt. Puerto Rico's Public Service Human Resources Administration Act ("PSHRA") provides that, upon receipt of a public employee's notice of resignation, the "appointing authority shall . . . give written notice to the employee of whether it accepts or refuses the same for there being grounds which warrant an investigation of the conduct of the employee." 3 L.P.R.A. § 1462e(13). This can be read as requiring the employer's acceptance before a resignation becomes effective. Per the implicit logic of *Brammer-Hoelter I*, then, Camacho was entitled to rescind his resignation unilaterally—at least prior to its acceptance. Such a rule would be consistent with that described in *Ulrich* and *Koltonuk* and would, moreover, make a great deal of sense. Camacho's initial letter was essentially an offer to resign; like any other offer, it could be rescinded before acceptance.

However, defendants also argue that Camacho's resignation became effective, and thus presumably irrevocable, 15 days after he submitted it, before it was formally accepted and before Camacho "attempted" to rescind it. Defs.' Opp. 8. This argument is based on a misreading of *Candelario Muniz v. Tribunal Superior*, 1 P.R. Offic. Trans. 37 (1973). There, the question was when a public employee who had not specified an effective date for his resignation ceased to be employed. Then-applicable law required that resignations be tendered "at least 15 days before the last working day," and no action was explicitly required by the employer for the resignation to take effect. *Id.* at 43. The Puerto Rico Supreme Court

noted that "[i]t is not logical to presume that a person who resigns a position . . . is bound to continue exercising it indefinitely until his resignation is accepted," and thus held that "one who resigns ceases in the job at the expiration of 15 days after filing the resignation since that is, pursuant to [statute], ' . . . *his last working day*.'" *Id.* at 43–44 (emphasis in original).

*Candelario* did not impose a per se rule that a public employee's resignation takes effect automatically after 15 days; rather, the court held that, absent any communication from his employer, the employee's employment ceases on "his last working day." The plaintiff in that case did not set an effective date for his resignation, so his last working day was determined by reference to the law providing that resignations must be tendered at least 15 days before they are to take effect. Here, though, Camacho did specify an effective date: June 28, later changed to September 5. It would make no sense to consider his employment ended automatically after 15 days when his notice of resignation plainly stated his last working day. Such an interpretation of *Candelario* would eradicate the significance of a resignation's effective date. And it is clear from the PSHRA, which requires employees to give notice "*not less than* ten (10) consecutive days before his/her last working day," 3 L.P.R.A. § 1462e(13) (emphasis added), and from the PRPD Staff Bylaws, which are identical but for requiring *at least* 15 days' notice, Docket No. 93-2, at 4, that employees may designate the effective date of their resignations. Camacho was thus still employed when he rescinded his resignation on July 5, and the PRPD had not yet accepted it on that date. If public employees in Puerto Rico have the right to rescind their resignations prior to acceptance—a question that neither party has addressed—the PRPD's acceptance of Camacho's resignation was a de facto dismissal.

Because I conclude, as discussed below, that Camacho's due process claim fails even if he successfully rescinded his resignation, I do not decide whether public employees enjoy the right to rescind their resignations under Puerto Rico law. If the rescission was ineffective, Camacho resigned and, at least if the resignation was voluntary, was not entitled to process upon his departure from the PRPD. To the extent he makes the argument that his

resignation was not voluntary—that he was constructively discharged—that argument fails. And if the rescission was effective, Camacho's due process claim is barred by the *Parrat-Hudson* doctrine.

### C.      Constructive Discharge

At least one federal court of appeals has recognized that a due process claim may succeed on a constructive discharge theory.  In *Stone v. University of Maryland Medical System Corp.*, the Fourth Circuit held that "if . . . [a plaintiff's] 'resignation' was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action triggering the protections of the due process clause."  855 F.2d at 173.  To show constructive discharge, a plaintiff must "show that [his] working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008) (quoting *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 117 (1st Cir. 2004)).  The word "compelled" is key; it is not enough to demonstrate that a reasonable person would have wanted to quit. "[R]ather, an employee must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship." *Id.* (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004)) (internal quotation marks omitted).  "In order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will." *Id.* (citing *Exum*, 389 F.3d at 1135).

Camacho cannot meet this exacting standard.  The record does not support a finding that his working conditions at the PRPD were so onerous that he had no choice but to resign. Though the amended complaint speaks of intense harassment, there is no evidence that Camacho was harassed at all.  He complains of the administration's failure to provide him with protection, but in fact he was provided with protective equipment upon request, and he declined to accept further protective measures offered by the PRPD.  His transfer to General Headquarters may have been unpleasant and even punitive, but that alone does not rise to the level of constructive discharge.  Moreover, "the fact that [he] attempted to rescind his

resignation . . . is clear evidence that [his] working conditions were not so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign, and that he had the opportunity to make a free choice regarding his employment relationship." *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 523 (1st Cir. 2009) (quoting *id.*; *GTE Prods. Corp.*, 421 Mass. 22, 34 (1995)) (internal quotation marks omitted).

### D.    *Parratt-Hudson* Doctrine[14]

If Camacho effectively rescinded his resignation, he was entitled to due process. However, "[d]ue process . . . is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). While a hearing is generally required before the deprivation of a protected property interest, in some circumstances the Supreme Court "has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.* Such circumstances were present in *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984). The First Circuit has summarized the holdings of those cases and their progeny thus: "When a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, . . . the due process inquiry is limited to the issue of the adequacy of the postdeprivation remedies provided by the state." *Hadfield v. McDonough*, 407 F.3d 11, 19 (1st Cir. 2005) (quoting *O'Neil*, 210 F.3d at 42). Where the deprivation was due to "random and unauthorized conduct" and the state provides an adequate postdeprivation remedy, state officials are shielded from a federal due process claim. *Id.* at 19–20 (citing *Mard v. Town of Amherst*, 350 F.3d 184, 193 (1st Cir. 2003); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 536–37 (1st Cir. 1995)).

Under the broad view of the *Parratt-Hudson* doctrine taken by the First Circuit,

---

[14] Defendants did not raise the *Parrat-Hudson* doctrine as a ground for summary judgment. "However, if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law, the particular legal argument relied on by the court need not have been suggested by the movant." *Packish v. McMurtrie*, 697 F.2d 23, 25 n.1 (1st Cir. 1983) (citing 10 Wright & Miller § 2730).

conduct is "random and unauthorized" when a state official "misapplies state law to deny an individual the process due under a correct application of state law." *Id.* at 20 (citing *O'Neill*, 210 F.3d at 50; *Herwins v. City of Revere*, 163 F.3d 15, 19 (1st Cir. 1998); *Cronin v. Town of Amesbury*, 81 F.3d 257, 260 (1st Cir. 1996) (per curiam); *Brown*, 68 F.3d at 536–37; *Lowe v. Scott*, 959 F.2d 323, 344 (1st Cir. 1992)). "In other words, conduct is 'random and unauthorized' within the meaning of *Parratt-Hudson* when the challenged state action is a flaw in the official's conduct rather than a flaw in the state law itself." *Id.*

*Hadfield* is instructive. There, the public employee plaintiff was denied a hearing upon his termination. *Id.* at 19. He argued that, under Massachusetts law, he could be discharged only for cause and therefore had a protected property interest in his continued employment. *Id.* The defendants disagreed, maintaining that state law exempted the plaintiff's particular position from civil service protection. *Id.* As I do here, the court declined to determine the correct interpretation of state law because even if the plaintiff had a property right in continued employment, his deprivation was caused by the defendants' random and unauthorized acts and the state provided an adequate postdeprivation remedy. *Id.*

As the court explained, the conduct at issue was "random and unauthorized" because plaintiff's claim "was not directed at the sufficiency of the statutorily provided pretermination procedures, but rather at the conduct of the government officials charged with implementing the procedures." *Id.* at 20 (citing *Cronin*, 81 F.3d at 260 & n.2). The "defendants erred (if they erred at all) by misapplying Massachusetts civil service law. This determination was not discretionary or governed by a formal or informal policy. Rather, if error, it was simply a misapprehension of state law." *Id.* (citations omitted). The court then concluded that a Massachusetts statute "allow[ing] a terminated employee to appeal the termination decision to the civil service commission and the state superior court (and, if successful, to obtain reinstatement and backpay)" provided a sufficient postdeprivation remedy for the defendants' potentially unlawful conduct. *Id.* at 21 (citing *Cronin*, 81 F.3d at

260; *Herwins*, 163 F.3d at 19–20).

The facts in this case are nearly indistinguishable.  As in *Hadfield*, if Camacho suffered a deprivation at all, it was due to defendants' mistaken interpretation of state law—here, as to whether he effectively rescinded his resignation.  Camacho does not argue, nor could he, the inadequacy of the pretermination procedures applicable to Puerto Rico career employees.  The PSHRA provides that "[t]he appointing authority may only . . . remove any career employee for just cause, after having given written notice of the bringing of charges and an admonishment of his/her right to request a hearing before action is taken." 3 L.P.R.A. § 1462e(4).  Commonwealth law does not authorize the dismissal of a career employee without notice and an opportunity to be heard, which is what happened here if Camacho was able to rescind his resignation unilaterally.  The PRPD did not have discretion to decide whether process was due to a career employee or whether the unilateral withdrawal of a resignation was effective; these are matters determined by state law.  *Cf. Zinermon*, 494 U.S. at 136–38 (holding that *Parratt-Hudson* does not apply where state law confers discretion on officials to decide what process is necessary).  And though the *Parratt-Hudson* doctrine has no force where the unlawful conduct at issue may be chalked up to an informal policy, *Hadfield*, 407 F.3d at 20 (citing *O'Neill*, 210 F.3d at 50), there is no suggestion that it was the PRPD's regular practice to conveniently misconstrue the legal effect of resignation revocations.  If unlawful, defendants' conduct was therefore "random and unauthorized" within the meaning of the *Parratt-Hudson* doctrine.

Furthermore, Camacho was afforded an adequate postdeprivation remedy by Puerto Rico law.  A public employee claiming "that an action or decision affecting him/her violates any right conferred to him/her by virtue of the provisions of this chapter" may contest that action or decision before the Appeals Commission of the Public Service Human Resources Administration System, 3 L.P.R.A. § 1468(1), which may "grant the remedies it deems appropriate," including reinstatement and backpay, 3 L.P.R.A. § 1468h(9).  The employee may then seek judicial review in Commonwealth court of the Commission's determination.

3 L.P.R.A. § 1468n.   Puerto Rico thus provides a postdeprivation remedy materially indistinguishable from the Massachusetts procedure found constitutionally adequate in *Hadfield*.  *See* 407 F.3d at 21; *see also Ramírez-De Leon v. Mujica-Cotto*, 345 F. Supp. 2d 174, 186–87 (D.P.R. 2004) (finding a due process claim barred because of the postdeprivation appeals procedure provided by a substantively identical statute, since repealed).   It is of no moment that Camacho did not make use of the postdeprivation remedy provided by the PSHRA; all that matters is that it was constitutionally adequate and available to him.  *Hadfield*, 407 F.3d at 21 (citing *Herwins*, 163 F.3d at 19).

Camacho's due process claims against the individual defendants in their personal capacities are therefore barred by the *Parratt-Hudson* doctrine and must be dismissed.

### E.    Qualified Immunity

Because I answer the first question in the qualified immunity inquiry—"whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right," *Maldonado*, 568 F.3d at 268—in the negative, I need not determine whether defendants are entitled, in their personal capacities, to qualified immunity because the right at issue was not clearly established at the time of its violation.

## IV.    Remaining Claims

All that remains are Camacho's Commonwealth law claims against the individual defendants in their personal capacities and the claims against Cartagena, against whom the case has been stayed.

After dismissing all claims conferring original jurisdiction, the court may in its discretion decline to exercise supplemental jurisdiction over pendant state-law claims.  *See* 28 U.S.C. § 1367(c); *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011).  While the pretrial dismissal of federal-question claims will generally point toward dismissing supplemental claims without prejudice, *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), the court must take into account "concerns of comity, judicial economy, convenience, and fairness" before eschewing supplemental jurisdiction, *Izquierdo*, 662 F.3d

at 49, weighing these factors in a "pragmatic and case-specific way," *id.* (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1996)). The parties have not addressed these considerations.

With regard to Cartagena, it appears from the record that Camacho would fare no better against him than against the other individual defendants. However, Cartagena has not moved to dismiss the claims against him, and I am not at liberty to override the stay already imposed.

Camacho is accordingly **ORDERED TO SHOW CAUSE**, at the pretrial conference set for December 19, 2014, why the Commonwealth law claims and the claims against Cartagena should not be dismissed without prejudice.

## CONCLUSION

For the above reasons, Camacho's motion for partial summary judgment is **DENIED**. Defendants' motion for summary judgment is **GRANTED IN PART**, and Camacho's § 1983 claims **DISMISSED WITH PREJUDICE**. Resolution of Camacho's Commonwealth law claims is deferred pending his compliance with the above **ORDER TO SHOW CAUSE**.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 18th day of December, 2014.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge